JOHN V. RICE, Administrator of JAMES RICE, deceased, complainant below, appellant, *v.* WILLIAM G. PENNYPACKER, Executor of ACHILLES HOLLINGSWORTH, deceased, AMOR H. HARVEY, and SUSAN Z. HOLLINGSWORTH, defendants below, respondents.

The statute of 1859, enabling parties in civil suits to call the adverse party as a witness, does not render competent a party who, although adverse upon the record, is otherwise incompetent as a witness for the party calling him by reason of interest.

Real estate, suitable for the business of a firm, was bid off in the year 1849, at sheriff's sale, by A. H., a partner of the firm of H., H. & Co., and title taken in his own name, part of the purchase-money being paid in cash out of the funds of the firm, and the balance secured by liens upon the property, of which liens most of the interest and so much of the principal as was paid prior to the death of A. H. were systematically drawn from the funds of the firm. The larger portion of the property was used by the firm for its business, and no rent paid or charged, rents from other portions being received by the firm, A. H., the purchasing partner, having charge of the firm's books. The evidence disclosed facts which warranted the presumption of an understanding or agreement among the partners that the property was purchased in trust for the firm, and that it was so held up to the death of the purchasing partner in 1865. The firm dissolved in 1854 by the retirement of J. R., the complainant's intestate, but no settlement was made with him, and the business was continued by A. H. and A. H. H., the remaining copartners, under the same firm name. Upon bill filed in 1873 by the administrator of J. R., *held* that the real estate, which since the death of A. H. had been held by his widow as devisee, was subject to a resulting trust as partnership property, in favor of the first firm of H., H. & Co., and that the complainant was entitled, as administrator of his father, J. R., to one-third of the proceeds thereof.

In the absence of fraud or breach of trust, property purchased with partnership funds does not of necessity become partnership property if that is not the intention of the parties.

The circumstance that the payment has been made out of the partnership funds, especially if the property purchased be necessary for the ordinary operations of the partnership business and be actually so employed, will afford a very cogent presumption that it was intended to be held as partnership property, and in the absence of all countervailing circumstances it will be absolutely decisive.

Claims of complainant for partnership balance due his intestate in 1854, for advances to the partnership by way of loans and otherwise, *held* to have been barred by the lapse of time. These claims having been barred before the death of the intestate, no diligence on the part of his administrator could relieve them from the bar of the statute.

The acknowledgment by a former partner that these claims were subsisting and unpaid, *held* insufficient to revive them as against the representatives of his deceased copartner.

A partner's lien, even upon the real estate of his firm for advances made to it, is a personal lien purely, in equity, and expires with the extinction of the claim by the bar of the statute.

THIS was an appeal from the decree of the chancellor sitting in and for New Castle County, and was heard before Comegys, C. J., and Wootten, Houston, and Wales, Judges, at the last and held under advisement until the present term of this court. The case as presented on behalf of the appellant in his bill of complaint in the court below was substantially as follows : In the year 1841 a firm consisting of Jacob Pierson and Achilles Hollingsworth was engaged in trade as machinists and black-smiths in the city of Wilmington, under the name of Pierson & Hollingsworth, with a partnership capital of about four thousand dollars, when Amor H. Harvey was admitted into an equal copartnership with them in the business upon his contributing the sum of two thousand dollars as part of the capital of the new firm, the name of which then became Pierson, Hollingsworth & Harvey, and that in the month of January, 1842, the said Jacob Pierson withdrew from it on selling his interest in it to James Rice for two thousand dollars, who was thereupon admitted into it as an equal partner with the said Hollingsworth and Harvey, when the name of the firm was changed to Hollingsworth, Harvey & Co. He, however, never became an active member of it, as he was otherwise engaged in the foundry business, which prevented him from taking an active part in the transaction of its business.

In the year 1849, and for some years prior to that time, James Hollingsworth and James Teas were engaged as partners in the like business in that city under the firm name of Hollingsworth & Teas, and as such partners held and owned certain real estate in it, while each of them also held and owned certain other real estate in it as his separate property, and as such firm had become indebted to the firm of Hollingsworth, Harvey & Co., in a certain judgment in the Superior Court in and for said county, it being No. 424, May term, 1848, in the real debt of two thousand

six hundred and fifty dollars, and also to the said James Rice separately in two judgments in that court, being respectively numbered 425, May term, 1848, for the real debt of one thousand five hundred dollars, and No. 232, November term, 1848, for the debt of one thousand two hundred dollars, which judgments, however, were subsequent and subordinate to sundry other liens in favor of several other parties existing against the real estate of the firm of Hollingsworth & Teas, and also against the separate real estate of each of the members of it, amounting in the aggregate to more than ten thousand dollars; and that the real estate of the said James Hollingsworth was additionally incumbered in the years 1848 and 1849 by a first mortgage made by him and his wife to the Wilmington Savings Fund Society for the sum of two thousand six hundred dollars, on which judgment had been recovered in the same court, being No. 185, May term, 1849, on which a writ of *levari facias* had been issued returnable to November term, 1849, in order to effect a sale of the real estate embraced in it; and by virtue of a writ of *fieri facias* returned to May term, 1849, and a writ of *venditioni exponas* thereon returnable to November term, 1849, issued upon the judgment of James Rice against the firm of Hollingsworth & Teas for one thousand two hundred dollars, the real estate of that firm, and also the separate real estate of each of the members of it, were levied upon, condemned, and advertised for sale by the sheriff of the county.

That during the time of the legal proceedings last referred to, it was agreed and determined on by and between the members of the firm of Hollingsworth, Harvey & Co., either to purchase the said real estate of the firm of Hollingsworth & Teas, and of James Hollingsworth and of Joseph Teas, or at least to bid it up at the sheriff's sale to an amount sufficient to cover the said indebtedness of the firm of Hollingsworth & Teas, both to the firm of Hollingsworth, Harvey & Co., and to James Rice individually, the object of any such purchase which might be so made by their firm being to recover the amount of its judgment, and also of the judgment of James Rice for one thousand five hundred dollars against the firm of Hollingsworth & Teas, either by a speedy sale of the said real estate by their firm, provided it could be sold

for the required amount, or otherwise by retaining and using it as partnership property, and that the said judgment of James Rice for one thousand five hundred dollars so entered into the consideration of their firm, for the reason that they looked upon the claim in the same manner as if it were a claim of the firm of Hollingsworth, Harvey & Co.; but James Rice did not wish to have his name connected with the legal title to the said real estate, as he was not an active member of the firm of Hollingsworth, Harvey & Co., and was otherwise engaged in the foundry business, and he therefore suggested that the title should be taken in the name of Achilles Hollingsworth, stating that it did not matter in whose name the deed was taken, inasmuch as he was to keep an accurate account of all moneys paid for and received from it; and in pursuance of that suggestion and of the determination and purpose of the firm, as before stated, Achilles Hollingsworth was authorized by it to attend the sheriff's sale of the said real estate and buy the same if it should not sell for a sufficient sum to cover the said judgment of the firm of Hollingsworth, Harvey & Co., and the said judgment of James Rice, on account of and for the use of that firm, and to take the legal title to it in his own name.

That afterward, on the 18th day of August, 1849, all the said real estate was sold at sheriff's sale, that of James Hollingsworth, covered by the said mortgage, for the sum of four thousand dollars, and all the rest of the real estate, together with all the said real estate of the firm of Hollingsworth & Teas and of Joseph Teas, for the sum of six thousand and forty dollars; and that Achilles Hollingsworth, pursuant to the agreement and determination of the firm and the authority given him for that purpose by it, attended the said sale in company with both of his partners, and bought all the said real estate so sold at it for the sums before stated, and which consisted of the following described parcels: No. 1, beginning at a stake on the southerly side of Second Street, at a distance of one hundred and twenty-one feet from the easterly side of Poplar Street, at a corner of Enoch Moore's lot, thence with said Moore's line south thirty-two degrees west, parallel with Poplar Street one hundred and sixty-three feet to a stake, thence north fifty-eight degrees west,

parallel with Second Street twenty-one feet to a stake, thence north thirty-two degrees east six feet four inches to a stake, thence north fifty-eight degrees west twenty-eight feet to a stake, thence south thirty-two degrees west twenty-eight feet to a stake, thence south fifty-eight degrees east fourteen feet to a stake, thence south thirty-two degrees west seventy-three feet to the northerly side of Front Street, thence and thereby south fifty-eight degrees east, about seventy-four feet six inches to the northerly side of the Philadelphia, Wilmington and Baltimore Railroad, and thence and thereby north eighty-six degrees east, about eighty-six feet to a stake in the said side of the said railroad, being a corner of Charles King's land, thence by the said King's land north twenty-seven and one-half degrees east, about ninety-one feet to a stake in a line of land of Levin Manlove, said stake being distant one hundred and sixteen feet from the southerly side of Second Street, thence along said Manlove's land north, fifty-eight degrees west about twenty-two feet six inches to a corner stake in the said line, thence by another line of Manlove's land north, thirty-two degrees east thirty-six feet to a stake in line of land of Henry Gottschammer, thence by the said line of Gottschammer north fifty-eight degrees west nineteen feet to a corner stake in said line, thence by another line of the said Gottschammer north thirty-two degrees east eighty feet to the said side of Second Street, and thence and thereby north fifty-eight degrees west seventy-five feet to the place of beginning; and No. 2, beginning at a stake in the southerly side of Third Street, at the distance of one hundred and thirty feet six inches from the easterly side of Poplar Street, at a line of land now or formerly of Abraham Rothwell, thence with the said land southerly parallel with Poplar Street one hundred feet to a stake, thence easterly parallel with Third Street twenty-one feet to a stake, thence northerly parallel with Poplar Street one hundred feet to the said side of Third Street, and thence and therewith westerly twenty-one feet to the place of beginning.

That the firm of Hollingsworth, Harvey & Co., by and through Achilles Hollingsworth, and by and through him only as the agent of that firm, bought all of the said real estate sold at the said sheriff's sale for the use and benefit of the firm and

for no other purpose, and that pursuant to the sale thereof the sheriff, by deed poll dated the 28th day of December, 1849, conveyed to him in fee simple the real estate of James Hollingsworth and wife sold by the sheriff on that day under the writ of *levari facias* for the sum of four thousand dollars, but for the real estate of the firm of Hollingsworth & Teas, and of James Hollingsworth and Joseph Teas sold by the sheriff under the writ of *venditioni exponas* to him for the sum of six thousand and forty dollars no deed appears of record from the said sheriff or from any other person or persons to him, notwithstanding he purchased the whole of the said real estate last referred to for the sum last mentioned under the authority and for the use and purpose before stated, except two indentures, one being from James Hollingsworth and wife dated the 28th day of August, 1849, for the consideration as therein stated of three thousand eight hundred dollars, which, however, is alleged in the bill to have been merely nominal, and that the deed was given for the purpose merely of barring the right of dower of the said wife in said real estate ; and the other being from the same persons dated the 23d day of October, 1849, for the consideration as therein mentioned of one thousand four hundred dollars, which is also alleged in the bill to have been merely nominal and that it was likewise made and delivered for the like purpose.    That the purchase-money paid for the said real estate was furnished wholly and directly from the partnership funds of the firm of Hollingsworth, Harvey & Co., and neither wholly nor in part from the individual funds of the said Achilles Hollingsworth, nor from him on his individual account, through the instrumentality of a loan or loans from the firm to him, or any other source or sources whatever, nor from the partnership funds in consideration of any loan or loans made by him to the firm; and that it was purchased in pursuance of the agreement and for the uses before stated in order to cover the claim of the firm under the judgment for the said sum of two thousand six hundred dollars, and of James Rice upon one or both of his said judgments amounting together to the sum of two thousand seven hundred dollars, for the reason that in view of its availability for the purposes of their partnership business, and of the existence

of said liens, apart from other considerations, it was worth more to the firm than the sum for which it was sold at said sheriff's sale ; and inasmuch as the firm had authorized him to bid it up to such an amount as would cover all the said claims, and he had succeeded in bidding it in for a sum less than that amount, the judgments last mentioned did in fact constitute a portion of the consideration and a material inducement upon which it was so bought by him for the use and benefit of the firm as aforesaid, and such purchase of it had never been productive of any benefit or advantage either to the firm or to James Rice by reason of said judgments except in so far as the benefit and advantage may have accrued to the firm from the possession, use, and ownership of it, may have exceeded the price at which it was purchased at the said sale, and, therefore, the existence of the said judgments would furnish a good ground for a just claim in equity on behalf of the said firm and James Rice to the said real estate independent of and in addition to such equitable rights thereto as would result to them as members and partners of the said firm from the purchase of it by him as aforesaid. And upon the supposition that the purchase of it was based in part upon the consideration of the said judgments as before stated, the members of the said firm afterward at his request released the said Joseph Teas from all further liability thereon, alleging as their reason therefor, that as they had thus got all there was of the property, they did not wish to hold him liable any longer upon them. But afterward, in or about the year 1860, Achilles Hollingsworth applied to Joseph Teas, who was then in more prosperous circumstances, to pay him something on the said judgment of the firm of Hollingsworth, Harvey & Co. against him, and upon such application he paid him the sum of about one thousand one hundred dollars, when Achilles Hollingsworth requested him to say nothing to James Rice about his having made him such payment on the said judgment ; and that neither he nor Achilles Hollingsworth ever mentioned the matter to James Rice, and that James Rice never knew the fact that such payment had been made upon it, the intentional concealment of which from James Rice constituted a gross fraud, in fact, upon his right as a partner in the said firm as aforesaid.

That at the time of the sale of the said real estate so bought by the firm of Hollingsworth, Harvey & Co., through the agency of Achilles Hollingsworth, there were situate upon it some buildings and structures which the firm of Hollingsworth & Teas had used in their business as machinists and black-smiths, and which by slight alterations were made suitable and convenient for the business of the firm of Hollingsworth, Harvey & Co. as at that time conducted ; and there was also at the same time a considerable amount of machinery affixed to the said real estate, a large portion of which was taken out and sold immediately after the said purchase by the firm of Hollings-worth, Harvey & Co., and that the proceeds of the sale thereof went into the possession of and were appropriated by that firm for their own use and benefit, and that no claim was then set up to them by Achilles Hollingsworth, and that he did not at the time of the purchase of the said real estate assert any claim or entertain any idea of setting up any claim that he had pur-chased it for his individual use and profit. And although the legal title to the same was vested in him, it was possessed and used in common by the first firm of Hollingsworth, Harvey & Co. for the purposes of its business from the time of its acquisi-tion until the dissolution of that firm, and afterward in the same manner by the succeeding firm of Hollingsworth, Harvey & Co., until the dissolution thereof by the death of Achilles Hollings-worth in the year 1865 ; and that neither James Rice nor his legal representative had or have released or conveyed his or their interest in the said real estate to any person or persons whatever. That the property was repaired from time to time during the continuance of the first firm of Hollingsworth, Har-vey & Co., and was repaired and improved wholly at the expense of that firm, and that all payments for taxes, insurance, and other expenses incident to the ownership of said real estate were wholly made by the firm last mentioned out of their own funds and for their own benefit. And that the rents and profits of so much of it as was not in actual use in the business of the firm by the permission of it were collected by Achilles Hol-lingsworth as the partner who had charge of the finances and accounts of it, and were supposed by the other members to be

properly entered in the books of account of it and duly accounted for, but which were from time to time as they accrued, fraudulently and in violation of the trust reposed in him by his said partners, appropriated by him to his own use, and were totally unaccounted for with some exceptions as appears by the books of account of the firm, although the legal title to the said real estate, including a machine shop and several tenement houses, was vested in him as before stated, with the understanding among all the partners that he should keep an accurate record of the receipts and expenditures on account of the same, which he not only failed to do, but he was also guilty of many and gross irregularities in keeping the accounts of the other transactions of the firm.

In the beginning of the year 1854, the firm of Hollingsworth, Harvey & Co. was laboring under considerable financial pressure, while James Rice was also individually laboring under great pecuniary embarrassment owing to the very large cash advances he had found it necessary to make from time to time to the firm for use in its business, which was rapidly increasing, and that Achilles Hollingsworth requested Amor H. Harvey to say to James Rice that if he would withdraw quietly from the firm that it would in time pay him in full, and so enable him to pay his creditors, but if he remained in the firm holding so many of its obligations, consisting of memorandum checks for individual money loaned the firm and for open partnership and private accounts, his creditors would force the firm into liquidation, and there would be such a sacrifice of its property as would ruin it without benefiting them, and upon that representation after much persuasion and some lapse of time he withdrew from the firm with the knowledge and consent of his principal creditors; and after such withdrawal that the firm obtained a considerable extension of time from its creditors, and from some of them as much as five years; but in consequence of the embarrassments of the firm at that time no settlement was had or could be had between James Rice and the other members of it on his withdrawal from it owing to its large indebtedness to him, as well for moneys advanced to it by him as for his interest as a copartner in the property and business of it.

It was next alleged that Achilles Hollingsworth died in the month of June, 1865, having duly made and published his last will and testament, whereby he gave all his property, real and personal, after the payment of his debts, to his wife, Susan Z. Hollingsworth, forever, and appointed William G. Pennypacker his executor, which was soon afterward duly admitted to probate by the Register of Wills of New Castle County, and by whom letters testamentary were thereon granted to the said Pennypacker, and that under and by virtue of it the legal title to the said real estate devolved upon Susan Z. Hollingsworth, and that since the death of Achilles Hollingsworth all the rents and profits of it, amounting to nearly two thousand dollars per annum, had been received and appropriated by the defendants, William G. Pennypacker and Susan Z. Hollingsworth, or by one or the other of them, and still continued to be so received and appropriated.

That Achilles Hollingsworth was a practical bookkeeper, well versed in bookkeeping, and for that reason was intrusted by his copartners, James Rice and Amor H. Harvey, with the entire care and management of the books, accounts, and finances of the firm last mentioned from its creation until its dissolution, and afterward until his death, but neither Amor H. Harvey nor James Rice knew anything about the practice of bookkeeping, and both of them reposed during the continuance of the partnership implicit trust and confidence in his integrity and ability, and that James Rice was merely a dormant partner in the firm last aforesaid, and as such he had no control over the management of its affairs or business, and did not in fact interfere with the same. And in addition to the equitable obligation which rested on the said Achilles Hollingsworth solely from his relation as a partner to keep correctly and accurately the books, accounts, and financial affairs of the firm, there was imposed upon him, by reason of the facts immediately before stated, an obligation in equity and good conscience more stringent and imperative than the ordinary obligation of a partner to discharge faithfully and honestly the trust which was thus specially reposed in him, and to keep the said books and accounts and financial matters with more than ordinary diligence and accuracy. But in addition to

his utter failure to discharge the obligation just mentioned, the bill of complaint further alleged that he was guilty of and did commit, both in his manner of keeping the said books of account and otherwise, gross and palpable acts of fraud against his partners, of which an instance had already been set forth in the fact before stated that when Joseph Teas upon his solicitation voluntarily paid him the sum of one thousand one hundred dollars or thereabouts still due upon the judgment of the firm against him but which had before that been released by the firm for reasons before stated, he requested him to say nothing about it to James Rice and never charged himself with the payment of that amount to him by the said Joseph Teas, or made any entry of it on the books of the firm, and of which other specific instances were thereinafter stated.

That James Rice from time to time during the existence of the partnership last aforesaid was accustomed to advance and did advance to the firm upon their application and by way of loan for their accommodation, sums of money, and taking therefor the memorandum checks of the firm, and occasionally received from the firm payments on account of such loans and gave therefor his memorandum checks to the firm in order to preserve the dates of said payments for the calculation of interest thereon, and at certain times the said memorandum checks were intrusted by him to Achilles Hollingsworth in his capacity of bookkeeper and financial partner, to have the amounts due upon the same with the interest calculated and any amounts paid to him by the firm as aforesaid on account thereof deducted, and the balances thus ascertained were entered to the credit of his personal account on the books of the firm. That the last settlement of that nature appeared to have been made and entered on the said books in the year 1849, and that afterward during that year and until his retirement as aforesaid from the said firm in the year 1854, he continued to make such advances, receiving the checks of the firm therefor made and signed by Achilles Hollingsworth, and also receiving occasional payments on account thereof from the firm in like manner as aforesaid.

And that at the time of his said retirement from the firm the memorandum checks so received and held by him since the last

settlement of similar ones before stated were also intrusted by
him to Achilles Hollingsworth for the like purpose as aforesaid,
who after calculating the amount of said checks with the inter-
est thereon and deducting therefrom the amount due from him
for similar checks given by him for payments made to him on
account of such loans by the said firm, he returned the firm's
checks to him with a memorandum of the balance due him be-
tween the two sets of checks aforesaid, amounting to the sum of
thirteen thousand five hundred and thirty-nine dollars and
eighty-six cents, but that he knowingly and fraudulently
omitted to make any entry of the said indebtedness, or of the
receipts of the several sums of money for the loan of which the
checks last aforesaid had been given upon the books of account
of the said firm. That the said memorandum checks represent-
ing the amount so loaned by him to the firm, with the memoran-
dum aforesaid, came into the possession of the complainant as
his administrator, and that the said checks, being both of them
in the handwriting of Achilles Hollingsworth, would naturally
tend to produce and did produce the impression that the said
checks had been settled; and it was not until the year 1869
upon accidentally acquiring possession of his memorandum
checks drawn for payments made to him by the said firm as
aforesaid during the period covered by the said checks of the
said firm, and also upon obtaining an opportunity for the first
time to inspect the books of the said firm, the complainant first
discovered the fraud perpetrated upon him as aforesaid.

That at the time of his retirement as aforesaid there was due
to him from the firm last aforesaid a large sum for castings fur-
nished by him to the firm, and that Achilles Hollingsworth cal-
culated the amount due on that account from the bills rendered
by him, and after deducting therefrom the checks against him
entered on his private account as distinguished from his com-
pany or stock account upon the books of the said firm, ascer-
tained the balance due him on such private account and made
and delivered to him the note of the said firm at six years for
the balance ascertained, which was two thousand five hundred
and ninety-six dollars and five cents, and which was in addition
to the sum of thirteen thousand five hundred and thirty-nine

dollars and eighty-six cents therein before mentioned as the balance due him on the memorandum checks, and was also in addition to his partnership interest in the business of the said firm when the same should be thereafter settled up and ascertained; and that on or about the 19th day of November, 1869, the said Amor H. Harvey made a distinct acknowledgment to the effect that the balance in his favor between the checks drawn by the said firm and held by him, and the checks drawn by him and held by the said firm and the said note of the said firm to him, amounting to the respective sums before stated, were still subsisting demands against the said firm of Hollingsworth, Harvey & Co.

That Achilles Hollingsworth, while acting as bookkeeper for the firm last aforesaid, did from time to time, during the existence of the said firm, and also of the succeeding firm, knowingly and fraudulently make payments of his own separate and individual debts, and for his own use and benefit, out of the partnership funds by means of checks of the said firms drawn by him upon the funds of the same deposited in bank without ever charging himself with the amount of such checks, or making any entry thereof against himself upon books of the said firm or firms, or in any manner to account therefor, and that it was his habit as aforesaid to fraudulently appropriate the funds belonging to the said firm to his own use, whereby both James Rice and Amor H. Harvey, his copartners in it, were defrauded of large sums of money, and by reason whereof the funds of the said James Rice were so completely absorbed that the financial embarrassment both of the firm and himself led to his withdrawal from the firm, and a settlement of its indebtedness to him was rendered impossible by the said firm.

That Achilles Hollingsworth and Amor H. Harvey were each entitled, by an agreement of the partners, to a salary of four hundred and fifty dollars per year in consideration of their personal services, and to put them upon an equal footing with the other partner, James Rice, who was not expected to give, and did not give, his personal attention to the business of the firm; and that Achilles Hollingsworth had no other visible means of support than that which he derived from his business, and lived

at an expense utterly unaccounted for by the amounts charged on the partnership books as drawn out by him, and, as appears from the books of the firm, he overdrew his accounts for a number of years and then ceased to post any personal accounts, and that he fraudulently expended large sums of money out of the partnership funds for his own use and benefit without ever accounting therefor, of which alleged fraudulent transactions, among many others so alleged, the following were specifically stated; that the following checks of the firm were paid by the bank and not entered upon the margin of the check-book or elsewhere in the books of the firm, and that the sums paid upon them were wholly unacounted for, to wit:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Oct. 6th, 1848, payable to William Bright for the sum of | | | | | | $80 | 00 |
| April 14th, 1849, | " | " | " | " | " | 20 | 00 |
| " 22d, 1849, | " | " | " | " | " | 150 | 00 |
| October 19th, 1850, | " | " | " | " | " | 250 | 00 |
| " 20th, 1856, payable to | "shop" | " | " | | | 10 | 00 |
| " 24th, 1849, | " | "selves" | " | " | | 940 | 00 |
| " 30th, 1849, | " | "shop" | " | " | | 12 | 00 |
| November 5th, 1849, | " | " | " | " | | 456 | 35 |
| " 8th, " | " | " | " | " | | 50 | 00 |
| " 21st, " | " | "selves" | " | " | | 5 | 00 |
| " 21st, " | " | " | " | " | | 65 | 00 |
| " 23d, " | " | "shop" | " | " | | 5 | 00 |
| " 29th, " | " | " | " | " | | 70 | 00 |
| " 24th, " | " | "McFaddin" | " | " | | 346 | 20 |
| " 24th, " | " | "shop" | " | " | | 85 | 00 |
| " 30th, " | " | " | " | " | | 10 | 00 |
| December 1st, " | " | " | " | " | | 75 | 00 |

with many others of like character, extending over the entire time that James Rice was connected with the said firm and afterward, and all of which the complainant craved leave to exhibit at the hearing of the cause. And that there were many other payments so made by him of large and small sums of which there was no charge on the books other than a memorandum upon the margin of the check-book, as follows :

| | | |
|---|---|---|
| January 9th, 1851, to William Bright, for | $50 | 00 |
| December 8th, 1856, to Joel V. Greenman, for | 13 | 13 |
| November 18th, 1851, to William Bright, for | 750 | 00 |
| "        24th,   "     " Joel V. Greenman, for | 36 | 66 |

And that in many of the cases which had come to the knowledge of the complainant, he had fraudulently made payments as before stated out of the funds of the firm, but wholly for his own use and benefit, as in the following instances: He held a policy of insurance in the American Life Insurance Company, of Philadelphia, for the sum of one thousand dollars, dated November 6th, 1852, upon which there became due quarterly premium payments in the sum of eight dollars and fifty cents, and a second policy of insurance in the same company for two thousand dollars, dated October 6th, 1855, on which like quarterly payments became due in the sum of nineteen dollars and sixty cents, also a third policy of insurance in the Penn Mutual Life Insurance Company, of Philadelphia, for the sum of three thousand dollars, dated February 27th, 1851, upon which premium payments annually became due in the sum of fifty-four dollars and forty-five cents, and that he fraudulently drew from time to time as they became due the checks of the firm upon the funds of it deposited in bank for the amounts so payable upon the three policies of insurance aforesaid, in many instances making no charge or entry against himself for the sums so drawn upon the books of the said firm so kept by him as aforesaid, notwithstanding the said bank checks so drawn but not charged as aforesaid were duly paid out of the funds of the said firm.

As an example of the manner in which he kept the books and accounts of the said firm, and failed to execute the trust reposed in him by his partners, the cash transactions of a single month, that of November, 1849, was referred to and stated as follows:

| | |
|---|---|
| On the first day that month the account of the said firm in bank was overdrawn    . | $363 10 |
| Total amount of deposits and discounts credited to the said firm during the month,   . . . . . . . . . . . | $4,399 .52 |

| | | |
|---|---:|---:|
| Leaving cash to the credit of the firm in bank to be accounted for during the month, . . . . . . . . . . . . | $4,036 42 | |
| To which must be added the amount overdrawn on the 6th of December following, . . . . . . . . . . . . | 62 14 | |
| | $4,098 56 | |
| The amount of cash credits on journal during the same month was . . . . $3,249 77 | | |
| The same on petit cash-book, . . . . . . 406 03–3,655 80 | | |
| Which deducted from funds actually in bank. left a balance totally unaccounted for which passed through his hands in one month of . . . . . . . . . . | 442 77 | |
| As appears from the above statement there were receipts actually deposited in bank during the said month to the amount of . . . . . . . . . . . . . . . | $4,399 52 | |
| There were cash debits in journal only of 1,703 05 | | |
| And on petit cash-book of . . . . . . 120 09–1,823 14 | | |
| The total of which was less by the sum of than the receipts as per bank-book. | $2,576 38 | |
| That there were checks drawn but not charged or accounted for during said · month amounting in the whole to the sum of . . . . . . . . . . . . | $1,285 54 | |
| The amount of cash deposited in bank being, as above stated, . . . . . . $4,399 52 | | |
| And the amount of cash debits accounting for cash received, . . . . . . . . 1,703 05 . | | |
| Also a note discounted to pay old one charged the same day, . . 1,435 00–3,188 05–1,211 47 | | |

whereby there appeared a balance of cash received and unaccounted for tallying with the amount of checks drawn but not charged; and these statements fairly indicated by way of exam-

ple the manner in which he kept the books of the said firm, while they showed irregularities which would have been sufficient to reduce the most prosperous business to a state of great financial embarrassment, and an utter inability to discharge its just obligations, as was the fact in that case.

That James Rice died January 1st, 1861, intestate, and letters of administration on his estate were duly granted by the Register of Wills in and for New Castle County to John V. Rice, the complainant, on the 6th day of March, 1861. That during his last illness and while he was on his sick-bed he sent for Achilles Hollingsworth in order to see and converse with him on the subject of the unsettled accounts between the said firm and himself, but Amor H. Harvey visited him on his death-bed and to him he said : " I am afraid Achilles Hollingsworth has deceived me. I sent for him to give me some evidence of your indebtedness more tangible than that which I hold that I may leave to my creditors," who reported the same to him and which he received with great uneasiness of manner, but finally, and only after the said Harvey had told him that James Rice was too sick to talk about business, he consented with great reluctance to go, and did go to see him, but he was then too weak to converse with him.

The prayer of the bill was as follows : 1. That the defendants respectively may under oath or affirmation answer such interrogatories to this bill of complaint appended as they are severally required to answer. 2. That the defendant, Susan Z. Hollingsworth, may be decreed to hold the real estate mentioned and described in the foregoing bill of complaint in trust for and to the use of the members of the late firm of Hollingsworth, Harvey & Co., first aforesaid, and the representatives of any deceased partner or partners, pursuant to the agreement as stated in the said bill of complaint, under which the said real estate was purchased and conveyed to the said Achilles Hollingsworth ; and further, that the said Susan ·Z. Hollingsworth may be decreed to account for any portions of said real estate which may have been sold, and the amount or amounts received in payment for the same by her, with interest thereon. 3. That the said real estate may be decreed to be sold by a trustee or trustees

appointed by this court for that purpose, that the said Susan Z. Hollingsworth may be decreed to convey the legal title to said real estate to such trustee or trustees, and that the proceeds of such sale first being paid into this court, such share thereof as the chancellor may ascertain to be due in equity and good conscience to your orator as administrator of the said James Rice may be decreed to be paid to your orator by a short day to be appointed for that purpose.    4. That an account may be taken of the whole amount which is due to the estate of the said James Rice for and on account of the amount of money advanced by him to the firm of Hollingsworth, Harvey & Co., last aforesaid, evidenced by the said memorandum checks, and of the amount of the private account of the said James Rice against the said firm for a part of which the said note was given, and also of the amount due to his estate on account of his interest as partner in the business of the firm last aforesaid, and also of the amount due to his estate up to the present time for his share of the rents and profits of said real estate as equitable tenant in common thereof, and that such sums so found to be due up to the present time, with interest thereon, together with his costs of this suit, may be decreed to be paid to your orator as administrator of James Rice out of the proceeds of the sale of the said partnership real estate, or out of any other property which may be found to be subject to the claim of your orator as hereinbefore stated.    5. That the claimant may have such other and further relief as the nature of the case may require.

By leave of the court, the bill of complaint was afterward amended as follows : That James Rice was naturally of a confiding disposition and more subject to imposition than the generality of men had they been placed in his position ; that the complainant never became aware that the real estate bought as aforesaid in the name of Achilles Hollingsworth was subject to any trust in favor of James Rice and his representatives until the year 1869, and it was only then discovered in consequence of his having an opportunity of examining the books of account of the firm of Hollingsworth, Harvey & Co., and thereafter through light thrown upon the subject during the course of a suit instituted by Amor H. Harvey in this court in relation to

the said real estate, and which had not yet terminated, that the complainant first became possessed of tangible evidence of the existence of such trust, the principal evidence of it having been until that year within the knowledge and possession of Amor H. Harvey, Achilles Hollingsworth, and his legal representatives. That the said real estate bought as aforesaid, but for which no deed appears of record as aforesaid, has been possessed by the first firm of Hollingsworth, Harvey & Co., by the second firm of that name, and by the legal representatives of Achilles Hollingsworth and their grantees, subject to the trust aforesaid, adversely to James Hollingsworth and Joseph Teas and the firm of Hollingsworth & Teas, and all others openly, notoriously, continuously, and peaceably for a period of more than twenty years; that at the time of the said withdrawal of James Rice from the said firm of Hollingsworth, Harvey & Co., it was fully understood and agreed between him on the one hand and Achilles Hollingsworth and Amor H. Harvey on the other, that he should give and the said firm should have, six years' credit at least, not only on the note given as aforesaid at that time, but also upon all other indebtedness of the said firm to him.

Amor H. Harvey's was the first answer filed to the bill of complaint, and admitted that Jacob Pierson and Achilles Hollingsworth were partners in trade as machinists and blacksmiths in the city of Wilmington, under the name, firm, and style of Pierson & Hollingsworth, with a partnership capital of from three to four thousand dollars, in or about the year 1841, and he was admitted into the firm as an equal partner during that year, upon the payment of two thousand dollars to the firm, on which its name was changed to that of Pierson, Hollingsworth & Harvey, and in about one year afterward the said Pierson disposed of his entire interest in it to James Rice for about the sum of two thousand dollars, who thereby became entitled to an interest of one-third in the business of it, and was duly admitted and recognized as an equal partner of it, on which its name was changed to that of Hollingsworth, Harvey & Co. In the year 1849 there was in the same city a firm known as Hollingsworth & Teas, consisting of James Hollingsworth and Joseph Teas,

engaged in the business of heavy forging and boiler making; that the said firm were the owners of real estate in said city, situated between Front and Second Streets and between Poplar and Lombard Streets, and both James Hollingsworth and Joseph Teas owned other real estate in said city in their individual right and capacity; that the said firm in the year last mentioned were indebted to the firm of Hollingsworth, Harvey & Co. in the sum of about two thousand six hundred dollars, and were also indebted to the said James Rice, one of the members of the firm last mentioned, in his individual right upon two separate judgments, one being for the sum of one thousand two hundred dollars, and the other for the sum of one thousand five hundred dollars, both of which were liens on the real estate of the said firm of Hollingsworth & Teas, and also on the real estate owned by each of the members of it separately; that upon the said debt of two thousand six hundred dollars, owing to the firm of Hollingsworth, Harvey & Co., judgment had been obtained and entered of record, and which was also a lien on the said real estate owned by the firm of Hollingsworth & Teas, and on the said real estate owned by each of the members of it separately. There were also other and prior liens at that time existing against the said real estate of the said firm, and against the separate real estate of each of the members of it, amounting altogether to about ten thousand dollars.

In the years 1848 and 1849 legal proceedings were instituted and prosecuted against the said firm of Hollingsworth & Teas, and in pursuance thereof the real estate of the firm and the separate real estate of each of the members of it was condemned and advertised to be sold on execution process by the sheriff of the county on or about the 18th day of August, 1849. That previous to the sale a meeting of all the members of the firm of Hollingsworth, Harvey & Co. was held to take into consideration the interests of their firm in regard to it, and owing to the fact that besides the said liens of their firm and of the said James Rice against the said real estate so advertised to be sold, and the said liens which were prior to them, amounting to about ten thousand dollars in the aggregate, there were other and subsequent liens against it held by other parties, among whom was

the firm of Orrick & Campbell, of Philadelphia, of whom it was reported that they intended to make it sell for enough at the sale to pay all the prior liens and satisfy their claims against the firm of Hollingsworth & Teas, it was thereupon verbally agreed between all the members of the firm of Hollingsworth, Harvey & Co. that, as the said real estate of the firm of Hollingsworth & Teas, or a portion of it, could be made suitable for the purpose and business of their firm, that the said firm should either buy it or bid it up at the sale to a sufficient sum to cover the liens of their firm and the lien of the said James Rice for the said one thousand five hundred dollars against it, and Achilles Hollingsworth was authorized to carry out the agreement. That at the time of making the said agreement and up to the time of the said sale it was believed that the said firm of Orrick & Campbell would be bidders at said sale, and that the said judgment of James Rice for one thousand five hundred dollars against the said estate of Hollingsworth & Teas and against the real estate separately owned by each of the members of it, was included in the limit to which the said Achilles Hollingsworth was authorized to bid for said real estate, and was an inducement for and formed a basis of the agreement of the said firm of Hollingsworth, Harvey & Co. to purchase the real estate at said sale ; but as it was bought in by the said firm at the said sale through the said Achilles Hollingsworth, in accordance with his instructions, at a much smaller sum than was required to cover the said liens of the firm of Hollingsworth, Harvey & Co. and the said lien of James Rice, this defendant cannot say of his own knowledge whether or not the said lien of James Rice for one thousand five hundred dollars was ever taken into consideration in the payment of the purchase-money for said real estate so sold by the sheriff and bought by the firm of Hollingsworth, Harvey & Co. as aforesaid, as no entry of such a transaction appears upon the books of the firm ; though he has no reason to doubt, and it is his impression and belief, that it was, for the reason that neither this defendant, nor the said Achilles Hollingsworth, nor both of them together, were able or had the means to buy and hold the said property, or even to pay the ten per cent. required to be paid on the day of sale without the assistance of the said James Rice.

All the real estate of the said firm of Hollingsworth & Teas, and of the said James Hollingsworth and Joseph Teas, the members of it, was sold on or about the 18th day of August, 1849, by the sheriff and purchased by the firm of Hollingsworth, Harvey & Co., Achilles Hollingsworth, one of the members of the firm being the bidder in accordance with the instructions given him by the said firm for that purpose, all the members of it being present at the said sale; and that the purchase-money for the said premises so sold by the sheriff and bought as aforesaid was paid exclusively out of the funds of the said firm of Hollingsworth, Harvey & Co. as the same was required and demanded. That the legal title to all the property so purchased by the said firm was taken in the name of Achilles Hollingsworth, one of the members of it, at the request of and in accordance with the agreement between the members of it to that effect, because the firm expected to sell it or that portion of it not intended to be used by them for the purposes of their business, and in that case it would be less expensive and more convenient to have the title in the name of one than in the names of all the partners, and for the further reason that the firm was advised that it was not material whether it was taken in the name of the firm or in the name of but one of the partners, as the property had been bought on the partnership account, was to be used for partnership purposes, and formed a part of the partnership assets, and for the further reason that the said James Rice, one of the members of it, did not wish to have his name connected with the legal title to the said real estate, as he was actively engaged in the foundry business in another part of the city, and was not an active member of the said firm, and for the further reason that there were judgments existing both against this defendant and the said James Rice, so that if the title had been taken in the names of all the members of the firm there might have been some difficulty in conveying the said property if they should wish to sell it. That the said real estate of the firm of Hollingsworth & Teas, and of the members of it individually, so purchased as aforesaid by the firm of Hollingsworth, Harvey & Co., was not productive of any benefit to the said James Rice in any manner whatever except by reason of its

use by the firm of Hollingsworth, Harvey & Co.    That a release was executed by the said firm some time after the purchase of the said real estate to the said Joseph Teas upon the consideration that it had got all the property there was, and did not wish to hold him liable for anything more upon the judgments; but afterward, some time about the year 1860, the said Joseph Teas paid to Achilles Hollingsworth the sum of one thousand one hundred dollars on account of his indebtedness to the firm on the said judgments.    This arrangement between Joseph Teas and Achilles Hollingsworth was effected, he is informed and believes, through the agency of Thomas Garrett, now deceased, for which sum Joseph Teas gave two notes, one for five hundred dollars and the other for six hundred dollars ; the former was paid at maturity, but the other never was collected by Achilles Hollingsworth for the firm or accounted for by him, nor has the said note ever been found, nor has the said firm been in any way benefited thereby, so far as he has any knowledge of it.

There were upon the said real estate when so purchased as aforesaid a one-story brick building about forty by ninety feet used as a forge shop, a one-story brick building ten or twelve feet square used as an office, and a one-story frame building thirty to forty feet square used as a boiler shop, and which, with the exception of the office building, were used by the said firm of Hollingsworth, Harvey & Co. in their business from the year 1850 until the death of Achilles Hollingsworth in the year 1865.    There was also some machinery in the building at the same time which was unfit for the business of the said firm, including one steam engine and boiler, one steam engine, two steam boilers, one steam hammer, and one or more trip hammers, which were sold by the said firm to several persons the proceeds of which were received by the firm for and on account of the firm ; and neither at the time of the sale thereof nor at any time thereafter was any claim made by the said Achilles Hollingsworth that the said machinery or the proceeds of the sale of it in anywise belonged to him solely or in his individual capacity.    That during the time the said property was so held and occupied by the said firm, and before the with-

drawal of the said James Rice from the firm in the year 1854, the said buildings were repaired and greatly improved, the forge shop having a second story of brick built thereon, windows cut and put in, two floors added to make it suitable for a machine shop, and an office and fire-proof compartment made therein, while the frame building used as a boiler shop was turned around so as to front on the railroad and was otherwise greatly improved. The said firm also during that time erected on the said premises a one-story smith shop built of brick, measuring about twenty-three by forty feet, a new frame boiler house, and put therein a twenty-horse power engine and boiler and shafting, together with some additional stabling and shedding built thereon necessary for the business and purposes of the firm, and all of the expenses of which were paid out of the funds of the said firm exclusively. And furthermore, that all the repairs and improvements put on the said real estate were made by the firm of Hollingsworth, Harvey & Co., from the time it was so purchased by them as aforesaid in 1849, until the death of Achilles Hollingsworth in 1865, and that the expense of all such improvements and repairs was borne by the said firm, and all taxes and insurance on the said property were during the same time paid by the said firm out of the common funds of said firm, and by no other person or persons or in any other manner.

That the rents and profits of the said real estate, so far as they were due and as they became due, were received during the whole period before mentioned, sometimes by the defendant but more frequently by the said Achilles Hollingsworth, but when received by this defendant they were always handed over to him to be entered on the books of the firm, and since his death they have been received, as this defendant is informed and believes, by William G. Pennypacker, his executor, and one of the defendants in said bill of complaint. But he verily believes that the said rents and profits so collected and received for and on account of the said firm previous to his death were not duly and properly entered upon the books of the said firm and accredited thereto by him, whose duty it was as the bookkeeper and financial partner of said firm so to do, but were appropriated by him.

That there were on the said real estate two frame houses on the railroad and one frame house on Front Street, neither of which ever rented for less than five dollars per month, also one two-story house with back buildings on Second Street, which never rented for less than one hundred and fifty dollars per annum, and one three-story brick house on Third Street, which never rented for less than one hundred and twenty dollars per annum; that there was no other property for which the firm received rent. This defendant is unable to state correctly the actual amount of rents received from the property, as no accurate account, he believes, has been kept of it in the books of the firm.

About the first part of the year 1854 the said James Rice became considerably involved financially in his own business as an iron-founder, owing largely to the fact that he had advanced at various times large sums of money to the said firm of Hollingsworth, Harvey & Co., and was not able to meet his payments, his principal creditor being his brother, John Rice; that the said firm of Hollingsworth, Harvey & Co. was indebted to the said James Rice in a considerable amount, which he desired should be paid to him, but which the said firm at that time was not able to do, and this defendant, at the repeated and urgent request of the said Achilles Hollingsworth, went on several occasions to him to persuade him to agree to quietly withdraw from the said firm, giving as the reason for it that if he remained in the firm holding its obligations for a considerable amount of money for money loaned by him to the firm, for castings furnished by him to it, and for his undivided interest in it, and his creditors should press for payment, the sacrifice would be so great as to ruin the said firm and would not benefit him, which, after much persuasion, he consented to do on condition that his brother, John Rice, would agree not to disturb his interest in the said firm until such time as the said firm should be in a condition to pay him the amount it owed him, and thereupon this defendant went to John Rice and persuaded him to assent to that condition, representing to him that the said firm then being in a prosperous condition, with its business constantly increasing, would eventually be able to pay James Rice all it owed him, and finding that

John Rice had assented to the condition, he withdrew from the said firm and was not after that time connected as a partner with it. And about that time, being in need of some money, the said firm gave him their note for two thousand five hundred dollars or thereabout, payable in five or six years, this defendant is not certain which, and he afterward told this defendant that he had lost it, and requested him to get Achilles Hollingsworth to give him a duplicate of it to replace the lost note, but when he mentioned the matter to him he replied, "We have as many notes out now as we can meet the payment of," and he did not, as the defendant believes, ever give him the duplicate note of the firm for it, or pay him the amount of the lost note on account of the firm.

That there had never been to his knowledge, at any time before or since the withdrawal of James Rice from the said firm, any settlement between him and the firm or any member of it on behalf of the firm, and that during the lifetime of James Rice, who died in 1861, no settlement was ever made, because Achilles Hollingsworth always represented that the firm was not in a condition to pay him what it owed him, and after his death and during the lifetime of Achilles Hollingsworth similar representations were made by him to this defendant, and which were communicated by him to the said John V. Rice, administrator of the said James Rice and complainant in the said bill of complaint, so that no settlement was ever effected during the lifetime of Achilles Hollingsworth, but after his death, upon a request made to this defendant by the said John V. Rice, administrator of James Rice, for a settlement of the accounts of his father with the said firm, he referred him to the said William G. Pennypacker, the executor of the said Achilles Hollingsworth, who afterward informed this defendant, when conversing with him in regard to the matter, that he (this defendant) had no right to pay over any of the proceeds or effects of the said firm to the said John V. Rice, administrator of James Rice, because the claims of the said James Rice were barred by the statute of limitations. Achilles Hollingsworth died in the month of July, 1865. That he professed to be, and was believed by this defendant and the said James Rice to be, well acquainted with the science and practice of bookkeeping,

of which neither this defendant nor James Rice had any practical knowledge; and that James Rice was a man of very confiding disposition, and more liable to be imposed on for that reason, than men of business generally are, and that entire confidence was reposed in the said Achilles Hollingsworth in the management of the accounts and finances of the said firm, both by James Rice and this defendant. That the said real estate purchased by the said firm as aforesaid was always mentioned and spoken of by Achilles Hollingsworth, James Rice, and this defendant among themselves as "our property," meaning the property of their firm; that there had never been any other understanding with regard to it between or among the members of the firm, and that on two or more occasions, when this defendant had expressed his own dissatisfaction and that of his personal friends who had on his account indorsed the notes of the firm, at the small income derived from the business of it, the said Achilles Hollingsworth had replied that he should not be discouraged, for the increasing value of the real estate of the firm would be a sufficient compensation to the members of it.

And this defendant always believed that the said complainant knew that his father, James Rice, was entitled to an interest in the said real estate at the time of his death, and also in the business of the said firm up to the time of his withdrawal from it in 1854. That he came to him some time in the fall of 1869 and requested him to let him see the books of account of said firm then in his possession, which he cheerfully granted, and gave him every opportunity and facility for examining them, and that when he informed the said William G. Pennypacker of it he appeared to be very angry and said to him that "he had no business to let him have them," but the defendant had no knowledge that the said complainant had ever before had any opportunity of examining the said books of account.

That the said real estate so purchased as aforesaid continued in the possession of the first firm of Hollingsworth, Harvey & Co. and of the second firm of that name from the time of its purchase in 1849 until the death of the said Achilles Hollingsworth in 1865, and that during that time no disposition or sale had been made of any portion of it by the said firm either before or after

the said James Rice's withdrawal from it; that since the death of the said Achilles Hollingsworth it has been in the possession of his legal representatives and their grantees, and that since his death this defendant has not received any portion of the rents and profits of it, although he is entitled to one-third thereof, as are also the legal representatives of the said James Rice, as this defendant believes.

That the said James Rice frequently advanced money to the said firm of Hollingsworth, Harvey & Co. for the use of the said firm in its business, which loans were generally made by his giving the firm his checks, though sometimes he advanced the money in bank-notes or coin. That it was the custom of the firm thus to borrow money from him for the purposes of its business, and he would generally loan the firm money when thus called upon, and the defendant had known him to borrow money on his own account in order to lend it to the firm; and at the time of his withdrawal from it there was a considerable amount of money due to him from the firm for castings furnished by him, for money borrowed from him, and for his interest in said firm; and when the firm borrowed money from him it would on such occasions, but on no other, give him memorandum checks representing the indebtedness of the firm to him for the money so borrowed from him; and that the evidence of the indebtedness of the firm to him for his interest in it, and for the castings and materials furnished by him, should appear on the books of the firm, to which the defendant craves leave to refer when produced in court, and that the same when so produced may be taken as part of this his answer.

That this defendant on one occasion, the date of which he does not remember, acknowledged to the said complainant that the balance in favor of the said James Rice upon certain memorandum checks in the possession of the complainant, and also the amount of a note for about two thousand five hundred dollars, held and lost by James Rice, were subsisting demands against the said firm of Hollingsworth, Harvey & Co., and to the best of his knowledge and belief they are still subsisting demands against the said firm.

That both this defendant and Achilles Hollingsworth received

a salary of four hundred and fifty dollars per annum in consideration of their personal services as active members of the said firm, he, the said defendant, having charge of the shops and mechanical part of the business, and the said Achilles Hollingsworth having charge of the books, accounts, and finances of said firm; that the said James Rice, not being an active partner in it or giving his personal attention to the business of it, never received any salary or compensation other than that which he derived from the business of the firm; and this was established and agreed upon between them when the said James Rice was admitted into the firm.

That the said Achilles Hollingsworth at no time during the existence of the said firm, either before or after James Rice's admission into it or his withdrawal from it, had any visible means of support for himself and family, except that which he derived from his connection with said firm and the salary fixed by law, which he was entitled to receive for some time during that period as a member of the City Council of Wilmington; and he had repeatedly declared to this defendant that he was entirely dependent on his salary as a member and his share in the profits of the business of the firm for his support.

That during the last illness of the said James Rice, in the latter part of the year 1860, this defendant visited him frequently, and on several of his visits he requested him to ask Achilles Hollingsworth to call and see him, as he wished to consult with him in relation to the unsettled accounts between himself and the said firm, and during said visits had expressed himself to him in this manner, viz.: " I am afraid Achilles Hollingsworth has deceived me.  Have I not sent for him to give me some evidence of your indebtedness (meaning the indebtedness of the said firm) more tangible than I now hold, which I may leave to my family and creditors?" and which requests and also remarks made by him he had communicated to him, but he always gave some evasive answer to such requests. That upon the occasion of his last visit to him, a day or two before his death, he remarked to this defendant in answer to some inquiry of his, " I have now given up all worldly business," and on his return from the visit Achilles Hollingsworth

inquired of him how he was, and when he informed him that he had then given up all worldly affairs, he seemed confused, and putting on his coat said he must go and visit him, which he then did, as this defendant is informed and believes, but he does not know whether he was admitted to the sick-chamber or not; of this, however, he is certain that the said James Rice was then too low to consult with him upon his business affairs and had given up all attention to worldly business.

The joint and several answer of William G. Pennypacker and Susan Z. Hollingsworth, the other defendants, admitted that in the year 1841 Jacob Pierson and Achilles Hollingsworth were partners in trade as machinists in the city of Wilmington under the name of Pierson & Hollingsworth, but they did not know whether the joint capital of the firm was or was not about four thousand dollars; that during that year the defendant, Amor H. Harvey, was admitted into partnership in the business with them, and that the new firm was then and thereafter known under the name and style of Pierson, Hollingsworth & Harvey. They admitted that he furnished or contributed at different times an aggregate sum of two thousand dollars or its equivalent toward the capital of the said firm, but denied that he contributed an equal share of capital with the other members respectively, and alleged that an inventory taken on or about the first day of February, 1841, of the tools, fixtures, stock on hand, and work in progress belonging to the said firm of Pierson & Hollingsworth by weight and estimate, and that the said inventory and appraisement of the goods and chattels therein contained amounted to the sum of nine thousand and sixty-nine dollars and ninety-five cents; that on the same day an inventory of the stock belonging to the said Amor H. Harvey, and then about to be contributed by him toward the capital of said firm, was taken, and that the same amounted by estimate and appraisement to one hundred and fifty dollars, amounting in all to nine thousand two hundred and nineteen dollars and ninety-five cents, and that the said Jacob Pierson, Achilles Hollingsworth, and Amor H. Harvey certified the same over their own proper handwriting to be satisfactory to them, and on the same day mutually agreed to put the foregoing inventory in joint stock

under the name of Pierson, Hollingsworth & Harvey, and that they were not aware of any other sum of money except cash at various times to the amount of one thousand eight hundred and fifty dollars, or contribution put in or made to the capital of the said firm by the said Amor H. Harvey to make his share equal to that of the other members respectively.

The said defendants also admitted that said Jacob Pierson on or about the 22d day of January, 1842, withdrew from the said firm, then selling his entire share and rights therein to the said James Rice, and that he was thereupon admitted into partnership with the said Hollingsworth and Harvey in the said business, and that the new and last firm was then and thereafter known under the name and style of Hollingsworth, Harvey & Co., but they did not know what was the consideration paid by him for the interest of the said Pierson, or whether the said three persons composing the said last-mentioned firm were or were not equal partners. They also further admitted that James Hollingsworth and Joseph Teas, in the year 1849, and for some time prior thereto, were partners in the said city as machinists and blacksmiths under the name and firm of Hollingsworth & Teas, and as such partners held and owned certain real estate in said city, and held and owned individually certain other real estate in it, and that the said firm was then the debtor of the said firm of Hollingsworth, Harvey & Co., in a certain judgment in the Superior Court at New Castle, being No. 424, to November term, 1847, in the real debt of two thousand six hundred and fifty dollars, and was also the debtor of the said James Rice in his individual capacity in two judgments in the said court, to wit, No. 425, to November term, 1847, for the real debt of one thousand five hundred dollars, and No. 232, to November term, 1848, for the real debt of one thousand two hundred dollars, but all of them were subordinate to other and prior liens against the real estate of the said firm of Hollingsworth & Teas and the real estate owned by the members of it individually and separately, amounting in the aggregate to about ten thousand dollars; also that the real estate of the said James Hollingsworth was in 1848 and 1849 subject to a first mortgage made by him and his wife to the

Wilmington Savings Fund Society to secure a debt of two thousand six hundred dollars, and that a judgment upon it was obtained in said court, being No. 185, to the May term, 1849, and a writ of *levari facias*, being No. 47, to November term, 1849, directed to Isaac Grubb, then sheriff of the county, was issued upon it to sell the real estate described in the said mortgage; and that by virtue of a writ of *fieri facias*, being No. 17, to May term, 1849, and of a writ of *venditioni exponas*, being No. 31 to November term, 1849, issued out of said court upon the said judgment of *James Rice* v. *Hollingsworth & Teas* for one thousand two hundred dollars, the lands of the said firm of Hollingsworth & Teas, and of the said James Hollingsworth and Joseph Teas, owned by each of them separately, were levied upon, condemned, and advertised for sale by the said sheriff. But they expressly and positively denied that during the time of the said legal proceedings, or at any other time, it was agreed by and between the members of the said firm of Hollingsworth, Harvey & Co., and by that firm determined, either to purchase the real estate of the firm of Hollingsworth & Teas and of James Hollingsworth and Joseph Teas, or to bid it up at the said sale so that the proceeds of it would cover the indebtedness of the said firm of Hollingsworth & Teas, both to the firm of Hollingsworth, Harvey & Co. and to James Rice, or any other agreement with reference to the purchasing of said lands. They also expressly and positively denied that the firm of Hollingsworth, Harvey & Co. at or about the time of such sale had any intention of making such purchase or bid, or that the object of any purchase which might be made by the said firm was to recover the amount of the said firm's claim and of James Rice's claim of one thousand five hundred dollars, against the said firm of Hollingsworth & Teas, either by a speedy sale of said real estate or by retaining and using it as partnership property, or that the said one thousand five hundred dollar claim of James Rice entered into the consideration of the firm of Hollingsworth, Harvey & Co., or that the said firm looked upon it in the same manner as if it were their claim; or that James Rice suggested that the title to the said real estate should be taken in the name of Achilles Hollingsworth; or that he

stated that it did not matter in whose name the deed should be drawn, inasmuch as Achilles Hollingsworth was to keep an accurate account of all moneys paid for and received from said property ; or that, in pursuance of any such suggestion or of any suggestion, Achilles Hollingsworth was authorized by the firm of Hollingsworth, Harvey & Co. to attend the sale of said real estate, and to buy the same if the proceeds of the sale of it should not be sufficient to cover the said judgments of the said firm of Hollingsworth, Harvey & Co. and James Rice on account, on behalf, and for the use of the said firm, and to take the legal title in his own name.

The defendants further admitted that all of the said real estate of the firm of Hollingsworth & Teas and of James Hollingsworth and Joseph Teas in said city was sold at sheriff's sale by said sheriff on the 18th day of August, 1849, the said real estate of James Hollingsworth covered by the said mortgage for four thousand dollars, and all the rest of the said real estate of the said James Hollingsworth, together with all the said real estate of the firm of Hollingsworth & Teas and of Joseph Teas, for six thousand and forty dollars. And that the said Achilles Hollingsworth attended the said sale and bought all the said real estate of the firm of Hollingsworth & Teas and James Hollingsworth and Joseph Teas, but they expressly and positively denied that he attended it or made such purchase in pursuance of any agreement or determination of the firm of Hollingsworth, Harvey & Co., or of any authority given to him by said firm for that purpose. They did not know whether the other two partners of said firm attended the said sale or not, and they did not admit that the said real estate was correctly described in the bill of complaint, but refer to the writs issued as aforesaid for the true descriptions of it. They also expressly and positively denied that the said firm of Hollingsworth, Harvey & Co., by and through Achilles Hollingsworth, or by and through him only as the agent of said firm, bought all or any of the said real estate at said sale for the use and benefit of the said firm, and for no other purpose or purposes ; but on the contrary they alleged that the said purchase was made by him on his own individual account in his own name

and for his own benefit, irrespective of the said firm, and that the same was so held by him from the time he so purchased it until his death. That the said sheriff by deed-poll dated December the 28th, 1849, conveyed to the said Achilles Hollingsworth in fee simple all of the said real estate of James Hollingsworth and wife sold by him on the day and year aforesaid under the said writ of *levari facias*, and for the said real estate of the firm of Hollingsworth & Teas, and James Hollingsworth and Joseph Teas, sold by him under the said writ of *venditioni exponas*, the said sheriff delivered to the said Achilles Hollingsworth a deed bearing date December the 28th, 1849, conveying the said real estate to him in fee simple, the records of which were duly referred to, etc. They had no knowledge whether the said Achilles Hollingsworth paid any sum for the consideration mentioned in the deeds of James Hollingsworth and wife dated August 28th, 1848, and of Joseph Teas and wife dated October 23d, 1849, or whether the same were executed for the sole purpose of barring any contingent right of dower in the said real estate.

They also expressly and positively denied that the purchase-money paid for the said real estate came wholly and directly from the partnership funds of the said firm of Hollingsworth, Harvey & Co., and alleged that the same came from the individual funds of the said Achilles Hollingsworth, and on his own account in the manner thereinafter set forth, that is to say, the first payment of one thousand and eighty-three dollars and thirty-eight cents made by him for the said real estate was made with the check of the said firm, but they (the defendants) alleged that the amount thereof was charged by the said firm against him and was repaid in full with interest to the said firm by him, and they expressly and positively denied that all or most or any of the subsequent payments for said real estate were derived from the partnership funds of the said firm, but alleged that the same were made by him with his own individual funds; and that at the said sheriff's sale he bought a portion of said real estate, to wit: Tract No. 2, described in the said writ of *venditioni exponas*, being a lot of ground with the house thereon erected, and took the title thereto from the said

sheriff in pursuance of said sale under and subject to a mortgage executed by Joseph Teas and wife to the Wilmington Fire Insurance Company for six hundred dollars, bearing date August 5th, 1846, and that the same was part of the consideration-money for said premises, and that these defendants have since the death of Achilles Hollingsworth paid the amount thereof out of his estate, and that on or about the 19th day of December, 1870, the said Susan Z. Hollingsworth sold and conveyed said Tract No. 2 to Jacob Reynolds, but the said premises were not adjacent to or connected with the remainder of the real estate purchased at said sheriff's sale, and were not used by said firm or claimed as partnership property.

And the defendants further alleged the said Achilles Hollingsworth, after purchasing the said real estate at sheriff's sale as aforesaid, for the purpose of raising the necessary funds to pay the balance of the purchase-money of ten thousand and forty dollars left after deducting the sum of one thousand and four dollars, it being the amount of the ten per cent. of the purchase-money paid to the said sheriff on the day of sale out of said one thousand and eighty-three dollars and thirty-eight cents, negotiated certain loans, and immediately after receiving the deeds of said Isaac Grubb, sheriff, as aforesaid, to wit, on the 28th day of December, 1849, executed mortgages upon the said real estate to secure said loans as follows :

1. To the Wilmington Savings Funds Society, dated December 28th, 1849, for . . . . . $2,400 00
2. To Ann Billany (same date) for . . . . . . 700 00
3. To The Delaware Fire Insurance Company (same date) for . . . . . . . . . . . 450 00
4. To The Farmers' Bank (same date) for . . . 2,100 00
5. To McDaniel & Harvey (same date) for . . . 1,800 00
And also his judgment bond to John Rice (same date) on which judgment was entered for . . 1,595 64
Add the ten per cent. above named, . . . . . 1,004 00

Making the total sum of . . . . . . . . . $10,049 64

That the said mortgages were executed by the said Achilles Hol-

lingsworth and Susan Z. Hollingsworth, his wife (one of the defendants), to the said parties respectively, in pursuance of arrangement made by him with them that the several amounts thereof which had been previously loaned to James Hollingsworth or to Hollingsworth & Teas, and were to be paid off with the proceeds of the said sheriff's sale, should be loaned to the said Achilles Hollingsworth, and that he was thus enabled to make up without any aid from the said firm of Hollingsworth, Harvey & Co., beyond the loan of the ten per cent. of the purchase-money as aforesaid, the full amount of said purchase-money (ten thousand and forty dollars), and that Achilles Hollingsworth at the same time, with the full knowledge of the said Amor H. Harvey and James Rice, effected an insurance in his own name upon the said premises, and gave his individual deposit note therefor and paid the premium thereon, and that he paid during his lifetime the interest on the said loans, and also the principal of the said

Mortgage. of . . . . . . . . . . . . . . $700 00

And on account of the principal of said mortgage of
$1,800, the sum of . . . . . . . . . . .   800 00

And the said judgment of . . . . . . . . . 1,595 64
                                          _____
                                          $3,095 64

And that these defendants have paid since his death the interest on the unsatisfied mortgages aforesaid, and also the principal of said

Mortgage of . . . . . . . . . . . . . . $450 00

And on account of the principal of the said mortgage of $2,100, the sum of . . . . . . . . .   500 00

And the balance due on said mortgage of $1,800,  . 1,000 00
                                          _____
                                          $1,950 00

And that the remainder or balance due on the said liens was still a claim against the estate of the said Achilles Hollingsworth, and amounted to the sum of four thousand dollars, and that neither the said James Rice nor his representatives nor the said Amor H. Harvey was or were in any way responsible therefor, or connected therewith. That no part of the principal or

interest of said loans was paid or contributed by the firm of Hollingsworth, Harvey & Co., or the said James Rice or Amor H. Harvey, but that the same had been paid out of the sole, separate, and individual property of the said Achilles Hollings-worth.

And the said defendants expressly and positively denied that the said real estate was so purchased in pursuance of any such agreement as is alleged in said bill of complaint, or for the uses therein alleged, in order to cover the judgment of the said firm of Hollingsworth, Harvey & Co. for two thousand six hundred dollars, and of James Rice upon one or both of his said two judgments, or for the reason that in view of its availability for the purposes of the business of the said firm and the existence of the said liens, apart from any other considerations, the said real estate was worth more to the said firm than the price at which it was struck off at the said sheriff's sale ; and they also denied that the said judgments did, either in fact or in law, form any part or portion of the consideration or inducement upon which the said real estate was bought by said Achilles Hollingsworth, or that the said judgments of the said firm and James Rice furnished the basis of any claim whatsoever in law or equity on the part of the said firm or of the said James Rice to the said real estate.

They also alleged with reference and in answer to the claim set up in the bill of complaint by the administrator of James Rice, deceased, to a share or interest in the said real estate, that no agreement in writing concerning the said lands or any part thereof, or any interest therein, nor any note or memorandum thereof in writing, had been or was made or signed by the said Achilles Hollingsworth, or by any person thereunto lawfully authorized by him, and they claimed the benefit of the statute for the prevention of frauds and perjuries in the same manner as if they had pleaded or demurred to the complainant's bill of complaint.

They also denied that any release was given by the said firm of Hollingsworth, Harvey & Co. to Joseph Teas from his legal liabilities to them on the said judgments in accordance with any supposition that the said purchase of the said real estate was

based in part upon the consideration of the said judgments, were held as liens upon it by the said firm or James Rice, or that any expressions were made by the said firm at the time of executing said release that they had gotten all there was of the property and did not wish to hold him subject to the said judgments, or that any such expressions, if made at all, were made because of any ownership or interest, actual or implied, by the said firm or by Amor H. Harvey or James Rice in the said real estate. They were not aware of any release executed by the said firm to Joseph Teas, but they had been informed that a portion of the judgment against him had been paid to them after the date of the said sheriff's sale they, however, did not know the time when or the circumstances under which the payment was made or the amount of it. And further, that they were informed and believed that upon the said real estate so purchased by the said Achilles Hollingsworth there were at the time of said purchase buildings and other structures which the firm of Hollingsworth & Teas had used in their said business which could, with alterations, be made suitable and convenient for the business of the firm of Hollingsworth, Harvey & Co. as at that time conducted. They also admitted that after its purchase by the said Achilles Hollingsworth the said real estate was enlarged, improved, and repaired, but they denied that it was done at the joint and common expense of the said firm of Hollingsworth, Harvey & Co., or in any other manner that would entitle the said complainant to any share or part thereof. They alleged that the agreement and understanding between the said Achilles Hollingsworth and the said James Rice and Amor H. Harvey was substantially as follows : At the time of the purchase of the said real estate as aforesaid, two engines and boilers and a trip hammer and all fixtures and machinery upon it passed as part thereof to the said Achilles Hollingsworth, the purchaser. At the request of the said firm, and upon their representation that the said engines and boilers were too large for the purposes of the firm, they and the trip hammer were sold, the said firm having agreed to put in, which they did, a smaller engine and boilers, and also having agreed with him to expend upon the said real estate in putting another

story on the shop and in otherwise improving it an amount equal in value to the amount of the sales of the said engines, boilers, and trip hammer. In making that improvement the firm charged him in his real estate account with all the brick and other material used in all the work and labor done upon the building, and erroneously credited the receipts from the sales of the said engines, boilers, and trip hammer to shop account instead of to him, the said Achilles Hollingsworth, without replacing them with machinery of equal value according to the said agreement. And they further alleged that the amount of the said sales greatly exceeded the amount expended for said improvements, and that Achilles Hollingsworth afterward applied to the other members of the said firm to make up the difference by putting in a Dimpfel boiler, which they agreed to do, and such a boiler was built by the said firm, but owing to the embarrassed state of the firm's finances and because they had an opportunity of selling it to advantage, it was sold by and on account of the firm, and an old steamboat boiler was put in instead of a new boiler.

The defendants also further alleged that Achilles Hollingsworth at the time of the purchase of the said real estate, and at all times thereafter up to the time of his death, asserted a claim to it as his individual property, and constantly set up the claim that he had purchased the same for his own use and profit, and did during his lifetime claim, charge, and receive rents for the said premises; that neither of the other partners of the said firm of Hollingsworth, Harvey & Co. during his lifetime set up any claim or right to the same, or claimed that the same was the property of the said firm; that they acquiesced, agreed, and asserted during a period of many years and up to the time of his death that the same was his individual property; that they were cognizant of and assented to the payment of rents for said premises to him, and that the said rents were claimed by and paid to him for his own separate and individual use with their knowledge and consent, and without any claim on their part that the said rents belonged to the said firm or that the other members of it had any joint interest therein or title thereto; that a part of them was paid to him through Amor H.

Harvey, and that the said Harvey repeatedly received said rents as his agent, and afterward paid the same over to him as his individual property without any claim that either he, James Rice, or the said firm had any interest therein or right or title thereto. And they further alleged that at no time within twenty years after the purchase of the said real estate did James Rice or his representatives or Amor H. Harvey intimate, pretend, or claim that he or they had any right, title, or interest in the said real estate, or that the same was held in trust by Achilles Hollingsworth for the said firm, or that the firm possessed or used the same for the purposes of their business in any other manner than as tenants of Achilles Hollingsworth, the owner thereof. And they denied that all payments for taxes, insurance, and other expenses incident to the ownership of said real estate were wholly made by the said firm out of their own funds and for their own benefit. They admitted that the rents and profits of said real estate not in actual use by the said firm were collected by him, but denied that he collected them by the permission of or for the said firm or as partner having charge of its finances; or that the other members of the firm supposed that they were entered in the books of account of or otherwise accounted for to the firm ; or that there was any understanding among the members of the firm that he should keep any account of the receipts and expenditures on account of said real estate ; and they alleged that in appropriating said rents to his own use he committed no fraud and violated no trust, but acted lawfully and honestly in all respects as he had a right to do with reference to his own estate, and which the other members of the firm had no right to control or dispose of in any way. They also admitted that up to the time of his death on the 12th day of July, 1865, he received the rents and profits of said real estate, but they were not informed of the amounts of them except as they stood to his credit on the books of the said firm when received for him by the firm and used by it; and that by his last will and testament he devised and bequeathed all his real and personal estate after the payment of his debts to Susan Z. Hollingsworth, his wife, one of the defendants, in fee, and appointed William G. Pennypacker, another of the defendants,

his executor, which after his death was duly probated and letters testamentary were thereon granted to the said executor, and that by virtue of said last will and testament the title to the said real estate vested in her, and that since his death all the rents and profits of said real estate had been received and appropriated by her and the said executor ; and insisting and protesting that they could not be legally called upon to answer what was the amount of the said rents and profits received by them or by the said Achilles Hollingsworth, nevertheless they were willing to state the amount thereof so far as the same was known to them.   The amount received by them since his death was about twelve thousand two hundred and fifty dollars, out of which the said Susan Z. Hollingsworth had paid taxes, insurance, repairs, and expenses on and connected with the said real estate.   But they utterly and positively denied that the said Achilles Hollingsworth was guilty of many and gross irregularities or of any irregularities in keeping the accounts of the transactions of the said firm.

They also admitted, according to the best of their information, that about the beginning of the year 1854 the firm of Hollingsworth, Harvey & Co. was laboring under considerable financial pressure, and that James Rice was individually laboring under great pecuniary embarrassment, but they expressly denied that his embarrassment was owing to cash advances made by him from time to time to the said firm for use in its business.   And they further denied that Achilles Hollingsworth requested Amor H. Harvey to say to James Rice that if he would quietly withdraw from the said firm it could or would in time pay him in full, and so enable him to pay his creditors, but if he remained in the firm holding so many of its obligations, consisting of memorandum checks for individual money loaned to it and for open company and private accounts, his creditors would force the firm into liquidation, and there would be such a sacrifice of its property as would ruin the firm.   They denied that James Rice retired from the firm at the request of Achilles Hollingsworth, or that at the time of his withdrawal from it he held any claims, memoradum checks, or amounts against it which were not finally and fully settled to him by the firm at the time of his with-

drawal from it; and they alleged that such a full and final settlement was made by the said firm to him at and upon his withdrawal for all loans which had been made by him to the firm, for his private and company accounts, for his bill for castings, and his claims of all kinds, and for his interest in the property and business of the firm. They denied that it obtained after his withdrawal any general extension of time from its creditors, though it was probable and they were willing to admit that some of its creditors did grant a temporary indulgence and forbearance of their demands; and they further alleged that there was no reason at the time of his withdrawal why a full settlement should not have been made between him and the other members of the firm, and it was not postponed because of any indebtedness of the firm to him, either for moneys advanced by him or for his interest as a copartner, but, in fact, a full and final settlement was made and evidences of indebtedness were given to him for the full amount due him on all accounts, which evidences of indebtedness were either paid or were allowed by him to be barred by the statute of limitations prior to his death, which took place about January 1st, 1861. That long prior to the institution of said suit the complainant had full access to and control over all the books, papers, and accounts of the said firm, and had fully examined them, had aided Amor H. Harvey in the preparation and prosecution of his suit and acted as his agent with reference to the said books, papers, and accounts in his possession for a long space of time, had made many pencil entries therein, and especially in the real estate account, and that he had sought to give testimony in the said cause to show that as early as the year 1864 he knew that a part of the purchase-money of the said real estate or a judgment given by Achilles Hollingsworth to John Rice for a part thereof had been paid by the said firm of Hollingsworth, Harvey & Co. in a note dated in 1861, and that whatever evidence was supposed to exist and show that Achilles Hollingsworth held said real estate in trust for said firm was in the possession of and known to the complainant long before 1869, and might have been known to him on inquiry and ordinary diligence upon his appointment as administrator of James Rice in March, 1861.

The defendants also admitted that Achilles Hollingsworth was a practical bookkeeper well versed in the science of book-keeping, and for that reason that he had the management of the finances and the general care of the books of the said firm, but they alleged that James Rice and Amor H. Harvey always had free access to said books and accounts, were cognizant of what they contained, frequently examined and consulted them, and fully understood and assented to the entries made therein ; that both of them had and exerted an equal control with Achilles Hollingsworth over the affairs of the firm, and well knew all that took place with reference thereto, were daily and constantly present at the shops of it and took an active interest in its affairs and work. And that Achilles Hollingsworth did honestly and truly execute and perform all the trusts reposed in him by the said parties, and did keep the books and accounts and financial matters of said firm with more than usual diligence and accuracy and in perfect good faith and integrity. They also denied especially and positively that he was guilty of or had committed any act of fraud whatever against his partners in the said firm. And they denied that James Rice was more subject to imposition or confiding in his disposition than the generality of men, but. admitted that he was during the time of his connection with the said firm also engaged in carrying on the foundry business on his own account, and alleged that he was a man of fair business abilities and knowledge, and by no means weak in mind or ignorant or yielding of his rights. They believed and admitted that he was accustomed to advance to the firm sums of money by way of loan, and also to indorse accommodation notes for it, and they alleged that the firm was accustomed to advance sums of money to him by way of loan, and did also from time to time repay to him the amounts so loaned by him, and did fully repay and extinguish all and every memorandum check taken for such loans.

And they denied that Achilles Hollingsworth knowingly and fraudulently omitted to make entry of any indebtedness to James Rice, or of the receipt of any sums of money for which any memorandum checks were given, or that any reason existed why upon the application of the complainant, or upon his making

inquiry and using ordinary diligence, he might not have had a full opportunity of inspecting the books of the said firm at any reasonable time or times since he became the administrator of James Rice, or that there was any error in the settlement made with James Rice, or that at the time of his withdrawal from the firm there was any credit given for any indebtedness, or that any indebtedness existed except for the note of two thousand five hundred and ninety-seven dollars and five cents, which was given to him by the firm in settlement of all sums due him; or that they were bound by any acknowledgment which might have been made by Amor H. Harvey at any time of any note, debt, or balance as a subsisting demand against the said firm in favor of James Rice or his representative; or that Achilles Hollingsworth at any time or in any manner, knowingly or fraudulently, made payments of his own individual debts, and for his own use and benefit, out of the funds of the said partnership, or did fraudulently omit to make any entry or charge of the same against himself on the books of the said firm, or to account for the same, or did fraudulently appropriate the funds belonging to said firm to his own personal use, or that James Rice or Amor H. Harvey were defrauded in any way by him of any sum of money, or that the funds of James Rice were absorbed, or his withdrawal from the firm was occasioned, or any settlement with him was rendered impossible, by or through any fraud of Achilles Hollingsworth, or that there was any agreement that he and Amor H. Harvey should each receive a salary of four hundred and fifty dollars per year in consideration of their personal services and attention to the business of the firm, and to put them on an equal footing with James Rice, except for a period of one or two years immediately after he became a partner in it, and for which they received credit, but that the agreement was that as James Rice could not give his personal attention to the business of it, being engaged in the foundry business on his own individual account, Jarrett Magaw should be employed and paid by him to perform his duties and services in the firm, and he engaged him for that purpose and agreed to pay him for his services, but he failed and neglected to pay him through many years, and the firm paid him,

and the sums so paid him by the firm were properly chargeable against James Rice and were never paid by him; or that Achilles Hollingsworth did, from time to time, or at any time, fraudulently draw checks of the firm upon its funds and make no charge or entry against himself for the sums so drawn; or that any irregularities were committed by him which in any way tended to injure the firm, or produce financial embarrassment, on the contrary, they averred that the success which was finally achieved by the firm after James Rice withdrew from it was almost entirely owing to the financial and business arrangements and management of Achilles Hollingsworth.

They further alleged that he had other visible means of support than that which he derived from the said business, and denied that he lived at an expense unaccounted for by the amounts charged on the partnership books as drawn out by him, or that he overdrew his accounts for a number of years and then ceased to post any personal accounts, or that he drew as much from said firm as Amor H. Harvey drew. That James Rice, during all his business relations with Achilles Hollingsworth, and up to the time of the former's death, had the warmest friendship for and unbroken confidence in him; that he frequently called on James Rice in his last illness and while he was able to converse about business, and that there was no application made to him by James Rice or anybody for him, and no necessity for any such application, to give any evidence of indebtedness to him; and they expressly denied each and all of the statements to the contrary in the bill of complaint on the authority of Amor H. Harvey; and that the bill of complaint filed in the cause and the claims therein made and the suit was prosecuted at the instigation of Amor H. Harvey, one of the defendants, and partly for his own pecuniary benefit; and that the said complainant and Amor H. Harvey had combined and conspired together for the purpose of establishing the said claim after the death of Achilles Hollingsworth and against his estate. And they craved leave to refer to the allegations and prayers contained in a bill of complaint theretofore filed in that court by the said Amor H. Harvey against these defendants, and in which the court had decided that so far as the interest

claimed by him in the said real estate was concerned that he had no such right, and that the said real estate was not subject to any trust whatever for the said firm of Hollingsworth, Harvey & Co. (of which James Rice was a member), but that the same was the sole and individual property of Achilles Hollingsworth in his lifetime, and of his devisee, Susan Z. Hollingsworth, since his death. And with reference to the claims set up in said bill of complaint to a share or interest in said real estate, the defendant alleged that the same were barred by the statute of limitations, for the reason that no such claims were set up or made within twenty years from the time the said real estate was duly and legally conveyed to and came into the actual possession of Achilles Hollingsworth.

And with reference to the claims set up in said bill for an account, or for the repayment of any sums of money loaned to the said firm by James Rice as therein alleged, or for any other cause therein stated, the defendants said that the complainant had had a full and complete remedy at law, and that the causes of action and matters there stated arose and accrued more than six years before the bill was filed or they, the defendants, were served with process, and they claimed the benefit of the statutes for the limitation of actions and suits at law in bar of the complainant's demands, with the same effect as if they had pleaded or demurred to the bill of complaint.

And lastly they denied all matters alleged in the bill of complaint which had not been therein expressly answered.

The testimony for the complainant filled a good-sized pamphlet in small type of one hundred and thirty-two printed pages, and that for the defendants against whom only relief was prayed a similar pamphlet of seventy-six printed pages, while the brief of argument of the counsel for the appellant in this court filled a similar pamphlet of eighty-one printed pages, and that of the counsel for the appellees, the defendants below, above referred to, filled another of one hundred and ninety-one printed pages. The reporter has therefore not attempted to compress a statement of either the evidence or the argument in the case within such limits as would be reasonable in any one volume of our law reports of six hundred printed pages, and which he is conscious could

not be done with proper fidelity to either, if such a condensation were attempted in the report of them as a constituent portion of the case. As, however, all the essential evidence and principles of law and equity involved and discussed and on which it was decided by the court hereafter sufficiently appear in the written opinions of the judges with which the report of the case closes, he feels satisfied that the omission is allowable under the circumstances.

*Houston, J.,* delivered the opinion of a majority of the court: The first matter we deem it proper to consider and dispose of in this case was the question raised as to the competency of Amor H. Harvey, one of the respondents, to testify as a witness for the complainant, and whose deposition and testimony the chancellor ruled out on the hearing of the case below, upon the grounds stated in his opinion, and in which we concur, with the additional reason for it, that notwithstanding he was a joint defendant in the suit, he was legally interested in the success of the complainant in it, and would gain by it because as only a year or two before this suit was instituted he had filed a similar bill as the surviving partner of the firm of Hollingsworth, Harvey & Co. against his present co-defendants, as the executor and devisee of his former and deceased partner, Achilles Hollingsworth, in which he alleged and relied on the same resulting trust in relation to the same real estate now in controversy in this suit, for the benefit of the late firm above mentioned, which is now alleged and relied on by the complainant in this case; and although the decree of the chancellor had been rendered and entered against his bill in that case and against such a trust, he was nevertheless directly interested in having it established in this case, inasmuch as two years had not elapsed after the signing of the said decree, and his right of appeal from it therefore had not been barred by the statute of limitations at the time when he was examined as a witness in this case.

It was contended by the counsel for the appellant that the ruling of the chancellor on that point was erroneous, and we were referred to both the forty-sixth rule of the Court of Chancery and to the provisions of the statute, *Rev. Code Amend.* 652, as constituting him a competent witness though a party to the

record in the case, because he had been called and examined at the instance of the adverse party in the suit. But we consider that the rule referred to only authorizes a party to the record to testify as to matters in which he is not interested for a very good and obvious reason, while the provisions of the statute construing the first as qualified by the second section of it clearly import, we think, that only a party adverse in interest as well as adverse in his position on the record of the suit is embraced within the true meaning and correct construction of them. These provisions of the statute we are well informed, however, are in point of fact but a literal transcript nearly of a similar statute previously enacted by the legislature of the State of New York, under which it has been decided in the courts of that State that the act of that State enabling parties in civil suits to call any adverse party as a witness was intended only to obviate the technical objection arising from the person called being a party to the record, but does not render him competent if he is otherwise disqualified. *Rich* v. *Hasson*, 4 *Sanf.* 115. It had also been previously ruled by the courts in that State that the only disqualification designed to be removed by the statute was that of being a party to the record, but if there be any other disqualification it is not removed by the statute. *Pillow* v. *Bushnell*, 5 *Barb.* 156. In both of the cases cited, although the person called as a witness was an adverse party to the record, it appeared that his interest in the event of the suit was in favor of the party calling him, and he was for that reason rejected notwithstanding the terms of the statute, the court holding that the intention of the legislature in enacting it was simply to supersede the rule of the common law which excludes a party to the record from testifying as a witness even in a case in which he may have no other interest in the event of it than his liability for costs provided it should be decided against him; and that it was only intended to render such an adverse party in any case a competent witness in it when called by the opposite party, but in no other case, though willing to testify for him. Applying the same rule of construction to our statute we are of opinion that Amor H. Harvey was not a competent witness for the complainant when he was examined as such in this case, notwithstanding

he was an adverse party defendant to the record of the suit, because we think it is sufficiently apparent from the facts before stated that he was directly interested in enabling the complainant by his testimony in the case to establish the trust now contended for by him in regard to the real estate in question, that it was by the agreement and understanding of all the partners purchased and held by Achilles Hollingsworth for the use and benefit of the firm, although deeded and conveyed to him alone by the sheriff, and that so far as it had been paid for from the date of the purchase up to the time of his death, it had been paid for by him out of the funds of the firm, with the knowledge and consent of the other partners, during James Rice's lifetime, and his own after his death, as property substantially belonging to the partnership.   Because, as we have before observed, he had himself previously filed a bill in the court below against his codefendants in this suit for a similar purpose, so far as the real estate then and now in controversy was concerned, with this difference only, that in that case the suit was by him as the surviving partner of the second firm of Hollingsworth, Harvey & Co., consisting of himself and Achilles Hollingsworth, after the withdrawal of James Rice from it, and was based on his equitable claim to one-half of it, as land held in trust by Hollingsworth for that firm, instead of the equitable claim now asserted by the complainant in this case to the one-third of it, as land held in trust by the same trustee for the first firm of Hollingsworth, Harvey & Co., consisting of himself, Achilles Hollingsworth, and James Rice, up to the time of the retirement of the latter from it; the only difference between his interest in that case and in this being the difference between the one-half and the one-third of it merely, but which, of course, constitutes no difference whatever in contemplation of law when we come to consider how far the direct interest to either extent which he may have in the event of this suit, rendered him an incompetent witness for the complainant at the time when his deposition was taken in it.   The counsel for the complainant in their argument upon this point of the case contended that so far as Harvey was then interested it was an interest in the question only, and not in the result of the suit itself to be decided by the court, and

that he was, therefore, a competent witness for the complainant under the rule of court and the statute before referred to and the decision of the courts in New York in the cases already cited. To our apprehension, however, he was interested not only in the question to be decided, but as a partner in both of the firms of Hollingsworth, Harvey & Co., so long as they respectively continued in existence he was directly interested in the very matter of this suit itself, the real estate involved in it, and, of course, in the result or event of it. For if the court below had decided, or this court should now decide, in conformity with his testimony (and which we may here add is the only direct testimony we have to that effect in the case), that the real estate in question was by the agreement of all the partners in the first firm purchased by Achilles Hollingsworth and taken in his name alone for the use and benefit of their firm, and so far as it had been paid for up to the time of his death that it had been paid for by him out of the partnership funds of the firm, and that it was therefore bought and held by him in trust for their firm, as one of the three equal partners in it up to the time of James Rice's retirement from it, he would certainly then have been, or would now be, *prima facie* equitably entitled to the one-third of it. This we certainly can say would be *prima facie* the direct and necessary result and conclusion of the case if such a decision had then been made in it by the court below or should now be made in it by this court.

We have before adverted to the bill previously filed by Mr. Harvey against his co-defendants in this suit in the court below, the decree of the late chancellor dismissing it, and to the fact that an appeal from that decree to this court had not been barred by the provisions of the statute of limitations applicable in such a case, when his deposition was taken in this suit, although the right of appeal from it is now barred if no appeal from it had been taken by him within the time limited by the statute; but whether, if it had been so taken, it would now be available for the enforcement of his equitable rights and claim against the defendants in that suit, and the recovery of his equitable interest, as one of the three partners in the first firm of Hollingsworth, Harvey & Co. in the one-third of the real estate in question,

had such a decision been made in this suit in the court below, or should now be made in it by this court, as we have before supposed for argument's sake, or what other remedy therefor he may have in such case, or what effect the discrepancies which appear between his bill of complaint in that suit and his answer filed and deposition taken in this case, might then have had, or may now have on his equitable claim to the one equal third part of the real estate in controversy in the alternative decisions before suggested, we do not consider at all material to the determination of the question of his direct interest *prima facie* in the result of this suit in the event of its being so decided by us; because viewed in the simple light in which the question is now presented to us, he is in our judgment clearly and directly interested in the result of the suit, and will gain by it an adjudicated equitable interest in one-third of the real estate in question, in case we decide in favor of the complainant on the grounds alleged by him that it was bought and held by Achilles Hollingsworth, and was paid for by him as before mentioned in trust for the firm, unless the contrary thereof should hereafter in some other suit be made to appear to the satisfaction of the court. In this aspect, therefore, his interest is identical with and not adverse to the interest of the complainant in the suit. Besides, and this we consider equally conclusive on the question of his being an adverse party in the case, no decree is sought against him in the suit, not even for the payment or satisfaction of any part of the alleged large amount of indebtedness of the first firm of Hollingsworth, Harvey & Co. to James Rice at the time of his retirement from it, for moneys alleged to have been advanced and loaned to it by him while he was a partner in it, and which constitutes so large a portion of the complainant's case, as presented in the bill of complaint with his proofs and exhibits against his co-defendants, and the real estate in question, or any other property in their hands which might be found subject to such claim. We are, therefore, of the opinion that Amor H. Harvey, although technically an adverse party defendant to the record of this suit, was not a competent witness for the complainant, and we have accordingly excluded his entire deposition from our consideration of the evidence taken and of the facts alleged and admitted in the case.

21

We would also remark in this connection that none of the admissions made in the separate answer of Harvey in favor of the claim of the plaintiff in any of its essential particulars, as alleged in his bill of complaint, and denied by his co-defendants in their joint and several answer, can be read in evidence against the latter, although the complainant and the latter defendants are the legal representatives of two of the deceased members of the first firm of Hollingsworth, Harvey & Co., which was dissolved in the year 1854 by the withdrawal of James Rice from it, and Harvey, the other defendant, was also the other member of it, and the question between them is the settlement of Rice's claims against that late firm for his equitable share and interest in the real estate which it is alleged was held in trust for that firm, and for the payment of its debts and the final adjustment of the partnership rights and interests of the several members of it *inter se* after the dissolution of the firm in that year, the connection of the partners as such having long since ceased and determined by the dissolution of the firm, Harvey not even being the surviving partner of it, as he was of the firm of the same name which succeeded it. 2 *Dan. Ch. Pl. & Pr.* 981 ; 1 *Greenl. Ev.*, sec. 178 ; *Chapin* v. *Colman*, 11 *Pick.* 331. Nor can any statements or admissions made by Mr. Harvey to or in the presence of the witness Mr. Robb, in the absence of the complainant, in regard to Achilles Hollingsworth's individual and separate ownership of the real estate, or to the effect that it was not held in trust by him for the use and benefit of the firm, be competent evidence in this case against the claim of the complainant in any of its branches or particulars, as the same are alleged and set forth in his bill of complaint.

With the evidence before specially referred to, and particularly the deposition of Mr. Harvey, which was taken subject to the exception filed before the commissioner, and the opinion of the court as to its admissibility, ruled out and entirely excluded from the case, the next most important question which presents itself for our consideration in relation to the proof introduced on behalf of the complainant, and which was very much controverted and discussed both in the examination of the various witnesses who were called on either side as experts in the busi-

ness of bookkeeping, and in the argument of the case by the counsel in this court is as to the true meaning, character, and construction of certain entries and accounts made and kept on the books of the firm of Hollingsworth, Harvey & Co. and other papers found among them in the handwriting of Achilles Hollingsworth, so far as they relate to the real estate from the time of its purchase at sheriff's sale in August, 1849, until the year 1858, when Mr. Robb became the bookkeeper of the firm, put in evidence, and to which we have been specially referred at much length and in minute detail, the chief dispute between the parties with regard to them being whether the entries and accounts referred to, as so made and kept on the books of the firm by him during that time, properly import upon their face a personal account of his own, as a member of the firm, for expenditures out of the funds of it by him on account of the real estate as his own separate and individual property, and for payments of principal and interest on the mortgages of it executed by him to the prior lien holders to secure the balance of the purchase-money after the payment of the ten per cent. of it by him out of the funds of the firm at the time of the purchase, and for subsequent alterations, improvements, and repairs of one of the buildings on the premises at the time of the purchase, and taxes and insurance on the real estate so purchased by him, or whether they properly import upon their face a partnership account of the firm for expenditures so made by him out of the funds of it for and on account of the real estate as the partnership property of the firm in fact, and not his own individual property. It should be observed in continuation of this summary statement that there are certain credits entered by him in the accounts referred to in the books of the firm of rents received by him from time to time from tenants of certain portions of the premises in question, not required or occupied by the firm in its partnership business, consisting of private residences, and rented to such tenants for that reason.

Upon this vexed question we regret, although we cannot add that we are surprised, to find that the professed experts to whom we have before alluded have radically differed in the opinions which they have expressed in respect to it, those examined on

behalf of the complainant unanimously holding that the entries and accounts, as so made and kept on the books of the firm by him, in their opinion import a firm or partnership account, and that the real estate to which they relate belonged to the firm, and not to Achilles Hollingsworth, the keeper of the accounts, individually, as his separate property, while those examined on behalf of the real defendants in the suit are unanimously of the opinion that they import a personal account of Achilles Hollingsworth, as one of the members of the firm, and that the real estate referred to in them belonged to him separately and individually, and not to the firm. Inasmuch, however, as it is manifest from an inspection of the accounts and books themselves, and it is conceded on both sides that the keeper of them, Mr. Hollingsworth, was evidently not an expert in what they have termed the science of bookkeeping, and that the accounts referred to are not kept by him according to any system or method of bookkeeping now recognized and approved by experts in that branch of business, it may well be doubted, we think, whether the question presented is a proper one to be solved by the opinions alone of persons particularly versed in the business according to the best and most approved methods now pursued by them. Because, if they were not kept, as it is admitted, according to any well-recognized and established plan of keeping commercial, manufacturing, or partnership accounts, why should the question as to the import of them be decided by rules which properly apply only to such a plan? But after all, the true question to be considered and decided by us in regard to the matter is, What did Achilles Hollingsworth himself mean and intend with reference to the actual and true ownership of the real estate, when the entries were so made by him on the books of the firm and the other papers referred to, as we now find them? Upon this point there is no direct evidence, and hence the effort to ascertain and fix the construction to be given to them by the opinions and testimony of the witnesses examined as experts in reference to them ; but the marked and almost equal division of opinion between them in regard to the matter, viewed even in the light in which they alone considered it, has only added another to the real question, we think, which

substantially underlies it.   What Achilles Hollingsworth himself meant when he made the entries in the accounts and papers referred to, so far as the actual ownership of the real estate was involved or concerned in them, must therefore be left, not to surmise or conjecture on our part, but to the most reasonable inference or presumption which arises from them in respect to that matter when considered in connection with such other facts and circumstances proved in the case as tend to throw any light upon it.

And considering such well-established facts in the case as we think are calculated and combine to shed no little or deceptive light on this question, the first to which we will refer is the fact that the real estate in question, in addition to other and prior liens amounting in the aggregate to about ten thousand dollars, was subject to a judgment of the firm of Hollingsworth, Harvey & Co. against the firm of Hollingsworth & Teas, then the owners of a part of it, and the members of which were at the same time the individual owners of the other part of it, for two thousand six hundred and fifty dollars, and also to two judgments of James Rice, one of the members of the firm of Hollingsworth, Harvey & Co., against the same defendants, and then owners of it, as before mentioned, the one for one thousand five hundred dollars, and the other for one thousand two hundred dollars.   It was then the site and place of a partnership business similar to that of the firm of Hollingsworth, Harvey & Co. carried on by Hollingsworth & Teas, and was well adapted to and favorably located in the city of Wilmington for such business.   At the sheriff's sale before mentioned, it was bid off by Achilles Hollingsworth for ten thousand and forty dollars, and for a sum just sufficient to cover all the liens resting upon it, and having priority to the judgment of the firm of Hollingsworth, Harvey & Co. for two thousand six hundred and fifty dollars ; and although no part of the proceeds of sale were applicable to it, or to either of the still younger judgments of James Rice before mentioned, it is a fact, we think, of no little import and significance in this connection that both James Rice and Amor H. Harvey quietly and silently acquiesced in his purchase of it at that price, and seem to have had no motive or

interest to make it sell for a larger sum, notwithstanding the three next oldest judgments in which they were respectively interested, as we have just seen, were entirely lost and sacrificed by it, unless they expected to obtain some equivalent for that loss, as members of the firm with Achilles Hollingsworth, in the purchase of the real estate by him on that occasion. And accordingly we hear nothing from them in relation to the matter, and nothing further from any quarter in regard to either of those judgments, until Teas, one of the members of the late firm of Hollingsworth & Teas, afterward voluntarily paid to Achilles Hollingsworth the sum of over one thousand one hundred dollars on the first of them ; that is to say, on the judgment of the firm of Hollingsworth, Harvey & Co. for two thousand six hundred and fifty dollars, against that firm, for his own release from his part of it; and the weight and effect and bearing of this latter circumstance upon the point we are now considering will only be the more apparent and striking when we recall to mind, in connection with it the testimony of James Hollingsworth, the other member of that late firm, in which he says, in his answer to the eleventh interrogatory propounded to him : " After the sale I had a conversation with both Achilles Hollingsworth and James Rice ; I told them that I felt under no moral obligation to pay the debts of the firm or of Mr. Rice either ; that they had got the property for half what it was worth ; if I was ever able to pay it I would, but I felt under no moral obligations to do it. I considered that they had got sufficient to pay it, and more too," evidently meaning by the use of the terms, "the debts of the firm or of Mr. Rice either," the judgment of the firm of Hollingsworth, Harvey & Co. for two thousand six hundred and fifty dollars against his late firm of Hollingsworth & Teas, and one or both of the two judgments before mentioned of James Rice against the same ; and that the firm of which both Achilles Hollingsworth and James Rice were members, that is to say, the firm of Hollingsworth, Harvey & Co., by the sheriff's sale, and their purchase of the real estate in question, had got it so much below its actual value that they had both been more than paid in point of fact for the judgments referred to which they held against his late firm. Whether either of them made any

reply to his remarks as thus detailed in his deposition is not stated, but as none is given, it is but reasonable to infer that neither of them denied that the firm of Hollingsworth, Harvey & Co. had become, by virtue of the sale referred to by him, the actual owners of the property.

The next in the order which we propose to pursue of the facts proved in the case, for the purpose which we have in view, has already been briefly adverted to, but we now recur to it again, and that is that one of the chief inducements which led to the purchase of the property by Achilles Hollingsworth was its peculiar fitness for the business of his firm as before stated. In the emphatic language of the same witness, when speaking of it in his deposition, " It was just the place for their business, and it was very natural for them to transfer their business to that place if they bought it." But notwithstanding it was not bought by them or conveyed to them, we find that the firm of Hollingsworth, Harvey & Co., soon after the purchase, transferred their business to it, took possession of, and continued to occupy and use so much of it in their partnership business as was required for that purpose, until the final dissolution of the firm of that name, and the discontinuance of the business by the death of Achilles Hollingsworth in the year 1865, without paying any rent to him for the same during that time, or any being charged to the firm by him on the books of it, or in any account stated or prepared by him in relation to it, or any of the members of it, so far as the evidence in this case goes, although the rental value of the premises so used and occupied by the firm during that time was, after his death, estimated, it seems, in the attempted settlement between Mr. Pennypacker and Mr. Harvey, at six hundred dollars per annum.

The next fact to which we shall refer, for the purpose stated, is proved by the testimony of the witness, Mrs. Patton, in regard to her renting, in the year 1860 or 1861, one of the dwelling-houses on a part of the real estate at the time of the purchase, but not required for the business or uses of the firm, and which had been previously rented to other tenants from the time the firm entered into possession of that portion of the premises which was occupied and used by them in their partnership busi-

ness. We only refer to so much of her deposition and the statement contained in it as stands unquestioned and unimpugned by the counsel for the defendants, the substance of which is, that she went there in 1860 or 1861, and lived there not longer than five years; she afterward adds, "I rented the house. I applied to Achilles Hollingsworth for the house. I found him down at the office of the firm at the machine shop. The firm of Hollingsworth, Harvey & Co. were indebted to me at that time in two thousand dollars; my husband had loaned the money. The firm paid me interest on the money prior to my taking the house; it was very hard to get it, and it was because I had hard work to get my interest that I applied for the house. I got the house to rent when I first applied to Mr. Hollingsworth for it. He did not hesitate a moment. Mrs. Baird lived there six years before I took it. She moved out to accommodate me, and let me in. I had no written lease at any time while I was in the house. I paid no rent, but lived in the house for the one hundred and twenty dollars a year—the interest. I never gave any receipt for the interest or received any receipt for the rent."

The next evidence in the case which we shall notice is the paper marked A, filed as an exhibit in the case on behalf of the complainant, found among the papers of the firm of Hollingsworth, Harvey & Co., and proved, and not denied, to be in the handwriting of Achilles Hollingsworth. The date of it, or when the statement which it contains was made by him, does not appear upon it, but the calculations of interest on the several mortgages against him referred to in it from the last preceding payment thereon in the year 1853 render it probable and reasonable to presume that it was made not a great while before James Rice's retirement from the firm, early in 1854, and about the time when it was found necessary, from the pecuniary embarrassment in which it was then involved, to obtain an extension of credit upon some of its liabilities, and the purpose of the paper would therefore seem to have been to show by an exhibit of its assets and liabilities that, although the firm was then embarrassed, it was not insolvent. The statement is as follows :

## PAPER MARKED " A."
### *Mortgages.*
### *Wilming. Savings Fund.*

*Mortgages against A. Hollingsworth.*

| | |
|---|---:|
| Wilmington Savings Fund, . . . $3,000 00 |
| Farmers' Bank, now held by the Savings' Fund, . . . . . . . 2,100 00 |
| Del. Fire Ins., . . . . . . . . 450 00 |
| McDaniel & Harvey, . . . . . 1,800 00 |
| John Rice, . . . . . . . . 1,595 64 |
| Robert E. Poole, . . . . . . 400 00 |

$9,245 66

Interest due, . . . . . . . . .  279 00

$9,524 66

*Judgments against Hollingsworth, Harvey & Co.*

| | |
|---|---:|
| Henry Rice, . . . . . . . . $900 00 |
| John Rice, . . . . . . . . 1,950 00 |
| Elizabeth Saunders, . . . . . 1,100 00 |
| Samuel McCaulley, . . . . . . 1,000 00 |
| Robert E. Poole, . . . . . . 1,000 00 |
| Jarrett Megaw, . . . . . . . 600 00 |
| Marena Jones, . . . . . . . 205 00 |
| Alexander Patton, . . . . . . 2,000 00 |

8,755 00

$18,279 66

| | |
|---|---:|
| Bills payable, . . . . . . . | 8,118 16 |
| Book ac. agst, . . . . . . . | 5,254 56 |
| Do. . . . . . . . . | 493 00 |

$32,146 22

| | |
|---|---:|
| Real estate, . . . . . . . . $14,000 00 |
| Shop, tools, etc., . . . . . . 21,580 00 |
| Saw Mill, . . . . . . . . 1,500 00 |
| Bills receivable, . . . . . . 1,559 00 |
| Book accounts, . . . . . . . 4,012 39 |

42,651 39

$10,495 17

First on the list of liabilities, it will be observed, is stated the mortgages against himself, and which were executed by him individually, of course, as the sole legal owner of the real estate in question, and which was mortgaged by him to the several mortgagees stated, who were the prior lien-holders to whom the balance of the purchase-money was payable on the confirmation of the sheriff's sale by the court, and to secure which, and obtain time for the payment of it, these mortgages, by an arrangement with them, were executed by him. And following them next will be found stated in the list of liabilities the judgment against the firm of Hollingsworth, Harvey & Co., and then, in the same list, bills payable and book accounts against the firm, making, when added up, the total amount of the liabilities of the firm thirty-two thousand one hundred and forty-six dollars and twenty-two cents. And then, and in the last place, follows a statement of the assets of the firm, and first on this list we find its real estate rated at fourteen thousand dollars; its shop, tools etc., at twenty-one thousand five hundred and eighty dollars; saw mill at one thousand five hundred dollars; bills receivable, one thousand five hundred and fifty-nine dollars, and book accounts, four thousand and twelve dollars and thirty-nine cents, making the total amount of assets forty-two thousand six hundred and fifty-one dollars and thirty-nine cents, which, deducted from the total amount of liabilities, leaves a net balance of assets of ten thousand four hundred and ninety-five dollars and seventeen cents. But the only question which it presents for inquiry, in connection with the other facts proved to which we have before particularly referred, is, what did he mean by including in the liabilities of the firm the mortgages of the real estate executed by him individually, and in the assets of it that same real estate which had been sold and conveyed to him individually? For it is proved, and not denied, that if the firm did not own *that* real estate, it owned none. The account of liabilities and assets as thus stated by him, without any connection with or reference to his own name or legal title, in the entry of the real estate among the assets of the firm, and with other valuable property, such as the "tools, etc.," which clearly belonged to it, certainly relieves it of any of the uncer-

tainty or ambiguity which characterizes some of the entries made by him in connection with or concerning the real estate on the books of the firm. And, as in the absence of any competent and direct evidence as to the interest of the firm in the real estate, we have thus far been reviewing the facts stated with a view to ascertain what is to be the most reasonable inference and presumption warranted by them and to be judicially drawn from them, may we not hold, with reference to this particular paper at least, that it goes even beyond presumption, and actually implies a deliberate admission on the part of Mr. Hollingsworth that the firm of Hollingsworth, Harvey & Co. at that time owned the real estate therein referred to, and in some way not incompatible with his deeds for it? This inquiry has been met with the suggestion that as his own absolute property, free of any trust, it would nevertheless have been liable for the debts of the firm of which he was a member, and recognizing, as he evidently did, in the first part of the statement, that it was so liable for the debts of the firm, he might well have included it afterward in his statement of the assets of the firm. But if that was his idea or his meaning, to be consistent and to complete the statement he should have included not only all his own separate property, but all the separate property of each of his copartners in the assets of the firm. And yet how could he reckon the mortgages against himself alone, although executed to secure the balance of the purchase-money, among the liabilities of the firm in any matter whatever, unless the firm had some property or ownership in point of fact in the real estate which alone was subject to the payment of them?

It further satisfactorily appears from the evidence in this case that Mr. Hollingsworth was the senior member of the firm and attended principally to the financial business of it, and had charge of and kept the books of it in his own handwriting chiefly until the year 1858, when Mr. Robb was employed as clerk, who afterward kept them until his death, in 1865, in like manner and mainly under his supervision and direction, but that they were always open to the view and inspection of the other members of the firm during business hours. That James Rice became a member of it in the month of January, 1842, as an

equal partner in it with Achilles Hollingsworth and Amor H.
Harvey, the other equal partners in it, but, being engaged in
another business in the city, he took no active part in the trans-
action of its business, and paid no personal attention to any
branch or portion of it during the time he continued a member
of it, which was until about the first of the year 1854, when he
voluntarily withdrew from it in consequence of the embarrass-
ment in which he had become involved in his other business.
That the real estate in question was advertised and sold by the
sheriff of the county on or about the 18th day of August, 1849,
under execution process issued upon two of the several mort-
gages and judgments against the firm of Hollingsworth & Teas,
with which it was then encumbered, the first of them being a
judgment in favor of the Wilmington Savings Fund Society,
recovered on a first mortgage made by James Hollingsworth, a
member of that firm, and his wife, to secure a debt of two thou-
sand six hundred dollars, and the other the judgment of James
Rice against that firm for one thousand two hundred dollars
before stated, while among the other judgments which then
rested upon it, but on which no executions were then in the
hands of the sheriff, was included the judgment of the firm of
Hollingsworth, Harvey & Co. against that firm for two thou-
sand six hundred and fifty dollars, and the other judgment of
James Rice for one thousand five hundred dollars before stated.
Excluding the testimony of Mr. Harvey for any purpose what-
ever in the case, we think that of Mr. Valentine, who was at the
sale, warrants the conclusion that all of the members of the firm
of Hollingsworth, Harvey & Co. also attended it.   Achilles
Hollingsworth was the highest bidder at the sale, and all the
real estate which was advertised to be sold in two allotments
was struck off to him, one allotment for four thousand dollars
and the other for six thousand and forty dollars, aggregating
ten thousand and forty dollars.   Ten per cent. of it was required
to be paid on the day of sale, and the balance of it on the return
and confirmation of the sale at the following November term of
the court.   The ten per cent. was not paid on the day of sale,
but whether any, or what kind of a note or other security was
given to the sheriff for it, or by whom, aside from the testimony

of Mr. Harvey does not appear from the evidence. It does appear, however, that interest upon it at the rate of six per cent. was afterward paid on or about the 24th of October following, when the principal of it was also paid to the sheriff.

In the meanwhile, the first entry that appears on the books of the firm, and which is admitted to be in relation to this real estate and in the handwriting of Mr. Hollingsworth, is a brief account on page 6 of book marked 33 by the examiner in this case, which is entered under the following heading in the book and in the following form :

DR.                    REAL ESTATE.                    CR.

1849.

Sept. 1. To cash paid Isaac Hollingsworth for fixing up
shop, . . . . . . . . . . . . . . . $4 00

Oct. 9. To cash paid Mutual Insurance Co. for one
year's insurance, . . . . . . . . . . . . 9 26

It is the only entry on that page or on the next four pages of the book, while the accounts on the preceding pages of it extend back from 1843 to 1838, and on the succeeding pages of it forward from 1843 to 1850, with a regular numbering of the pages from the commencement of them up to page 66, and then with a new numbering of them from 1 up to 6, on which we find the above entry, and from that on with regularity to page 265 ; there are, however, numerous pages in it still remaining entirely blank. It perplexed some of the expert bookkeepers examined as witnesses in the case not a little to determine whether it is to be considered an original or ledger entry ; but considered alone as it thus stands on the book by itself, and without any reference to a subsequent entry made by him on another book of the firm, to which we shall next have occasion to turn, they all on both sides seem to agree that it properly imports on the books of the firm a firm account, and that the firm was the owner of the real estate referred to in the heading of it. And judged by their rule or standard of decision only, it would seem as clearly to import an admission on his part that at the time when that account was opened and those entries were made

by him the real estate referred to was the real estate of the firm.

As before stated, the ten per cent. of the purchase-money, with the interest upon it from the day of sale, amounting to one thousand and fifteen dollars, as calculated by him, was paid to the sheriff about the 24th of October of that year, out of the funds of the firm, as satisfactorily appears from the evidence and is not controverted in the case. The sale was thereupon returned and confirmed at the following November term of the court, and on the 28th day of December following the sheriff executed and delivered to Achilles Hollingsworth two deeds in fee simple for the two allotments of the real estate so sold to him on the 18th of August preceding, and on the same day on which the deeds were delivered to him, Mr. Hollingsworth, to secure the payment of the balance of the purchase-money, which amounted to nine thousand and thirty-six dollars, and was applicable to the mortgages and judgments of the prior lien-holders before referred to, pursuant to an arrangement with them for the purpose, executed mortgages of himself and wife to them upon the real estate so sold and conveyed to him by the sheriff, as follows :

1. To the Wilmington Savings Fund Society, dated
    December 28th, 1849, for . . . . . . . . .$2,400 00
2. To Ann Billany (same date), for . . . . .   700 00
3. To the Delaware Fire Insurance Company (same
    date), for . . . . . . . . . . . . . .   450 00
4. To the Farmers' Bank (same date), for . . . . 2,100 00
5. To McDaniel & Harvey (same date), for . . .  1,800 00
And also his judgment bond to John Rice (same date),
    upon which judgment was entered, for . . .  1,595 64
Add 10 per cent. above named, . . . . . . .  1,004 00
                                             ─────────
        Making the total sum of . . . .$10,049 64

And which the defendants, Mrs. Hollingsworth and Mr. Pennypacker, in their answer allege were executed to the said parties respectively, in pursuance of an arrangement made by him with them that the several amounts thereof (which had been previously loaned to James Hollingsworth, or to Hollingsworth

& Teas, and which were to be paid off with the proceeds of the said sheriff's sale) should be loaned to him, and that he was thus enabled to make up without any aid from his firm, beyond the loan of the ten per cent. of the purchase-money as aforesaid, the full amount of such purchase-money (ten thousand and forty dollars).

The next entry and account on the books of the firm in the handwriting of Achilles Hollingsworth is the one that has given rise chiefly, if not solely, to the controversy in the case about who paid for the real estate in question, so far as it was paid for from the 24th of October, 1849, up to the time of his death, Achilles Hollingsworth, or the firm of Hollingsworth, Harvey & Co., and to the real dispute and exact question involved in it, as we consider it, whether he meant it to be when he entered it, as we find it on the books of the firm, a firm account or a personal account of his own merely as one of the members of it.    It relates to the ten per cent. of the purchase-money (one thousand and four dollars) and the interest thereon for sixty days, ten dollars, paid by him on the 24th of October, 1849, as we have before seen, with the checks of the firm, as appears from them and the entries in the bank book of the firm of that date, and some other payments made by him on account of the real estate up to the date of the entries in addition to the ten per cent. of the purchase-money and the interest on it until it was paid.    It is on page 1030 of the book marked D, and is as follows :

WILMINGTON, Dec. 31st, 1849.

Achilles Hollingsworth (for real estate) Dr. to cash for ten hundred and four dollars which he paid to Isaac Grubb, sheriff, in October last, being ten per cent. of the purchase-money on the property of late James Hollingsworth and Joseph Teas, of which he purchased at sheriff's sale in August last,  . . . . . . . . .  $1,004 00

For ten dollars paid interest on the above acct. for 60 days,  . . . . . . . . . . . .  10 00

For eleven 50-100 dollars paid Thos. S. Mehaffy, tax against H. Teas' property,  . . . . .  11 50

| | | |
|---|---:|---:|
| For sundry expenses to New Castle, . . . . . | $3 | 50 |
| Three dollars paid Isaac Hollingsworth for fastening up shop, . . . . . . . ... . . . | 3 | 00 |
| Nine 26-100 dollars paid Insurance Company, Oct. 14th, . . . . . . . . . . . . . | 9 | 26 |
| Two 12-100 dollars paid Biddle, Prothonotary, . | 2 | 12 |
| Twenty dollars paid to Mrs. Ann Billany, for interest on bond, . . . . . . . . . . . | 20 | 00 |
| | $1,083 | 38 |

There are also sundry other accounts in his handwriting in relation to expenditures upon or concerning the real estate on other books of the firm, and particularly upon page 179 of book marked C, and ledger page 37 of book marked E, and ledger page 55 of book marked 32, headed "A. H. for real est.," as to the import of which, as well as the import of the account just stated in full, the experts examined equally differed, those on behalf of the complainant holding that they clearly imported real estate belonging to the firm, and those on behalf of the defendants, Mrs. Hollingsworth and Mr. Pennypacker, that they clearly imported real estate belonging to Achilles Hollingsworth individually; and yet it appears from the day books of the firm also kept by him that original entries of charges to him for or on account of the real estate are made to no small amount in the aggregate, which are not posted to his accounts for real estate in the ledgers, while there is otherwise no little evidence furnished by the books themselves that they were not only unskillfully, but sometimes inaccurately, if not carelessly, kept by him. As proof of this, we will take occasion to specially refer to but one example of it, because it is so palpable that the defendants above named were obliged to admit the important fact alleged in the bill of complaint that there was at the time of the purchase of the real estate a considerable amount of machinery affixed to it, a large portion of which after the purchase and after they had entered into possession of the premises the firm sold and appropriated the proceeds of the sale of it to their own use, and that no claim to the same was

then made by Achilles Hollingsworth. This they could only explain by a counter statement, if it be correct, imputing to him an obvious error, as he was then the keeper of the books of the firm, and made the entries in the account in relation to the matter to which they refer in their answer to the bill on that point, and which is to this effect: that at the time of the purchase of the real estate all the machinery on the premises passed to him as the purchaser, as a part thereof, but at the request of the firm and upon their representation that the two engines and boilers and a trip-hammer which constituted a portion of it were too large for the purposes of the firm, they were sold, the firm agreeing at the same time with him to put in a smaller engine and boilers, which they did, and to expend an amount equal to that for which the two engines, boilers, and trip-hammer were sold in putting another story on and in otherwise improving the shop upon the premises; further, that in making the improvement, the firm charged him in his real estate account with all the brick and other materials used in and with all the work and labor done upon the shop, and erroneously credited the receipts from the sale of the said engine, boilers, and trip-hammer to the shop account of the firm, instead of to the said Achilles Hollingsworth, and that too without replacing said engines, boilers, and trip-hammer with machinery of equal value, according to the agreement. And here, without repeating what we have before said in regard to the remarkable difference of opinion expressed by the experts as to the scientific import of the headings and entries of the several real estate accounts as kept by him on the books of the firm to which we have referred, and in view of the fact that they are doubtless justly susceptible of either of the constructions which in the judgment of such witnesses has been given to them, may we not reasonably presume that he meant they should have both in the better understanding and more familiar knowledge of all that pertained to the interests and affairs of the firm, possessed by his copartners in it, and of their respective relations to it, and that they were so entered and kept by him simply to show to them that while he was drawing money from the copartnership funds of the firm to the amount which has

22

been satisfactorily proved in this case, he was honestly charging himself with it on the books of the firm, and was at the same time honestly expending it on the real estate which was held in his name for the benefit of the firm, if it be true that it was so held by him according to the understanding of all the members of it, as the complainant contends ?   For it only remains for us to add on this point that it clearly appears from the books that he kept no account whatever that can be strictly and appropriately called or considered a personal account of his own as an individual member of the firm, separate or distinct from such as those we have been considering, and that if he did not intend them to be understood and considered as firm accounts also, then it was very strange as well as injudicious and unfortunate for him that he inserted and kept them all among the firm accounts of the copartnership exclusively, instead of in a separate and distinct account of his own and rather in the form of partnership accounts than in the form of personal accounts simply.

It is stated both in the bill and in the answer of the defendants before referred to, and who, we may here say, are the only parties to this suit actually adverse in interest to the claims and demands of the complainant, or who deny or controvert any of the material statements on which they are founded, that Achilles Hollingsworth paid on the foregoing mortgages and securities executed by him to secure the balance of the purchase-money for the real estate as before stated, between the date of their execution and his death in 1865, both the principal and interest of the following :

The mortgage of Ann Billany, for . . . . . .     $700 00
On the mortgage of McDaniel & Harvey, for $1,800,     800 00
The judgment of John Rice, . . . . . . . .   1,595 64
                                            _____
                                             $3,095 64

The above statement as carried out in the column of figures on the right hand contains only the amount of the principal paid on the several securities mentioned ; but it is contended by

the complainant, and from the cash books, bank, or check books, and the canceled checks of the firm in the handwriting of Achilles Hollingsworth produced in evidence, taken together (the bank or check books supplying in a few instances the deficiency in the non-production of the canceled check for the same amount), it appears that there was also paid by him during the same period, out of the partnership funds of the firm, interest on the several securities so executed by him for the balance of the purchase-money for the real estate to the aggregate amount of seven thousand and sixty dollars and forty-four cents. And they also further show that the payments of the interest so made by him were charged by him invariably in the firm accounts on the books of the firm, or were not charged at all by him ; while the evidence in the case does not show any payment of the interest as otherwise made by him, except the amount of five hundred and seventy-four dollars so paid by him and wholly unaccounted for.

In opposition to the foregoing review of the facts in the case clearly and satisfactorily established, to be considered by us as the evidence of the equitable claim asserted by the complainant on behalf of the firm to the real estate in question, it must be admitted that there is but little, if any, direct and positive proof on the other side beyond the admitted and fundamental fact on which the case proceeds from its inception, and that is, that the unqualified legal title to it was vested in Achilles Hollingsworth from the delivery of the deeds of the sheriff to him, with the ruling before announced excluding the admissions of Mr. Harvey as testified to by Mr. Robb in the absence of the complainant as wholly incompetent and inadmissible to affect or compromise in any manner his rights or interests in this suit. And without that testimony, and the statements and admissions of Mr. Harvey, made either to him or Mr. Pennypacker, on the occasions referred to, and as detailed by him, the question upon the proof as to the actual and *bona fide* and beneficial ownership of the real estate, seems now on the part of the defendants to depend entirely upon the construction we are to give to the several accounts pertaining to it on the books of the firm, from the purchase of it up to the time of the death of Achilles Hollings-

worth, and the other papers produced in evidence in relation to it. In the answer of the defendants it was expressly denied that any of the payments for the real estate were made by Achilles Hollingsworth out of the partnership funds of the firm, and alleged that the same were made from his individual funds and on his own individual account. But on the evidence coming in, and with the proof before us in the case that the first payment of one thousand and four dollars in cash was made out of the partnership funds for it, prior even to the acquisition of the legal title to it by him, and that, on the same day he acquired the legal title to it, he executed mortgages upon it to secure the balance of the purchase-money to the parties respectively entitled to it, and that all the payments of principal and interest that were afterward made upon them during his lifetime were made by him out of the partnership funds, the ground of defense has been shifted on that branch of the case, and has practically resolved itself into the single question whether the firm loaned him the money with which they were so made for that purpose, or whether it merely furnished the money to be so paid by him for the use and benefit of the firm as virtually the *bona fide* purchasers, holders, and owners of it from the time of the purchase, although the deeds for it had been executed to him alone, as the sole purchaser of it. And, as we have before said, the defendants, to establish their contention that it was a loan of the money by the firm to him as the sole and absolute owner of it, for the purpose of enabling him to pay for it as such owner, now rely almost entirely, if not exclusively, on the construction to be given to his real estate accounts, as well of receipts of rents from tenants in possession of parts of the real estate, as of expenditures made upon it, as they appear on the books of the firm.

But as this is now the vexed question of the case, and is still open to further inquiry and consideration, we must again resort to what would seem to be the most reasonable and material presumptions which arise out of all the facts and circumstances proved in the case that bear upon the question. And the first which presents itself in this connection is the fact, too painfully and distinctly proved, that with all the frugality, industry, energy, and enterprise which characterized the firm and the individual

members of it, and with all, or nearly all, of the capital and means of the two active members of it invested and absorbed in its business, it is proved to have been, from the start up to the time of James Rice's withdrawal from it, and for several years afterward, sorely straitened and much embarrassed for the want of money to carry on their business, and although the purchase of the real estate, with all the special advantages which specially fitted it for the business of their firm, particularly upon the long credit upon which it was purchased, may have been both a desirable and judicious purchase for them, yet we cannot believe, in view of these circumstances, that any member of the firm would have considered it able to advance the money to pay for it, as a loan merely, even to the member who purchased it; while at the same time we cannot even conceive what motive either of the other members could have had for loaning him the money for that purpose, since, if the firm had to advance money to pay for it, it was obviously so much more for their interest and benefit that the firm itself should become the owner of it. Each member of it seems, from the evidence, to have had at all times quite as much as he could do to keep the firm itself supplied with sufficient funds for the transaction of its business and the maintenance of its credit and solvency by loaning to it whatever sums each could contribute from his own means, or borrow from his relations or friends, in every pecuniary emergency which arose in its affairs, and which is strikingly exemplified with reference to the partner, James Rice, in particular, by the exhibit of the long list and large amount of memorandum checks for the moneys thus loaned by him to the firm during the ten or twelve years he continued a member of it, while Achilles Hollingsworth himself, as the witness, Mr. Valentine, informs us, "always seemed to be looking after money for the firm, which, from the time he knew it all the way through up to 1862 was always hard up," to use his language. Can it then be reasonably supposed that under such circumstances and in such a condition of the firm James Rice, or any other member of it, could have thought of loaning such a large sum of money, even to their copartner, Mr. Hollingsworth, to pay for the real estate and make it his own property absolutely, when it would have

been manifestly so much better for the other members of the firm and would have required no more of the firm to make it partnership property ?  The question, therefore, which we have now to determine is whether, with all these facts and circumstances before us, and with direct and positive proof of a satisfactory character, that the money with which the payments before stated were made, were drawn by him from the partnership funds, and that we have no direct evidence beyond that with regard to the matter, it is more reasonable to conclude that the firm simply loaned him the money for that purpose, or that, pursuant to some understanding at the time between the partners not disclosed to us, he was to buy the real estate at the sheriff's sale, take the deeds in his own name for it, for the use and benefit of the firm, execute the mortgages to secure the future payment of the purchase-money, and the firm to supply the money for the purpose as it should be required until paid ? Of these two alternative presumptions and conclusions, upon all the facts and circumstances proved, we have no hesitation in saying, after mature consideration, we deem the latter much the most reasonable and probable, and have therefore come to that conclusion in the case.

And such being the conclusion of fact to which we have arrived from the evidence, we next proceed to state the legal result to which it has led us on this branch of the case, and that is, that in the consideration of a court of equity, under the facts and circumstances proved, and the reasonable presumptions warranted by them, in our judgment Achilles Hollingsworth took and held the legal estate in the land subject to a resulting trust for the firm, then consisting of himself, Amor H. Harvey, and James Rice.

For, as a general principle, what will constitute a resulting trust in a case like this is well settled and recognized by every elementary writer on the subject, we believe.  It is thus stated by *Sugden*, " If a man purchase an estate, and do not take the conveyance in his own name only, the clear result of all the cases, without a single exception, is that the trust of the legal estate, whether freehold, copyhold, or leasehold ; whether taken in the name of the purchasers and others jointly, or in the

names of others without that of the purchaser ; whether in one name or several ; whether jointly or successively, results to the man who advances the purchase-money ; and although the persons in whose name the conveyance is taken execute no declaration of trust, yet a trust will result for the person who paid the money by operation of law—this species of trust being expressly excepted out of the statute of frauds." *Sug. on Vend.* 414, 415. *Story* also states it as an established doctrine, now no longer open to controversy, in nearly the same terms. 2 *Story Eq. Juris.*, sec. 1201. And *Spence*, treating of trusts by implication and construction of law, that is to say, of implied trusts, resulting trusts, and constructive trusts, says of the latter, "Trusts of this description depend upon the conclusions of law independently of contract, and often arise in cases where there was no intention to create a trust on the part of any of the parties concerned ; generally speaking they are imposed *in invitum."* 1 *Spence's Eq. Jurisdiction* 508. And to show that he intends to include in this description what are more usually denominated resulting trusts, he afterward states as his first illustration of what he calls constructive trusts the case of a purchase made by a man, or by his direction, and with his own money, the conveyance being in fact taken in the name of another,—" The trust of the legal estate has been said in this case also to result to the man who advances the money." *Ibid.* 510; *Dyer* v. *Dyer,* 2 *Cox.* 93. And to show that it is particularly approved and applied by courts of equity in such cases as this to joint purchasers in the way of trade and for purposes of partnership, *Story* adds in regard to it, that "The same rule is uniformly applied to joint purchases in the way of trade and for purposes of partnership, and for other commercial transactions, by analogy to, and in expansion and furtherance of the great maxim of the common law : *jus accrescendi inter mercatores pro beneficio commercii locum non habet.* In cases, therefore, where real estate is purchased for partnership purposes and on partnership account, it is wholly immaterial in the view of a court of equity in whose name or names the purchase is made and the conveyance is taken ; whether in the name of one partner, or of all the partners ; whether in the name of a stranger alone, or of a stranger jointly

with one partner. In all these cases, let the legal title be vested in whom it may, it is in equity deemed partnership property, not subject to survivorship, and the partners are deemed the *cestuis que trust* thereof." 2 *Story Eq. Juris.*, sec. 1207. It is true, and one or more of the cases cited in the argument by the counsel for the defendants show, that in the absence of fraud or breach of trust, property purchased with partnership funds does not of necessity become partnership property if that is not the intention of the parties, as where the funds are so used by one partner in a separate purchase on his own account and for purposes wholly independent of the partnership. " But the circumstance that the payment has been made out of the partnership funds, especially if the property purchased be necessary for the ordinary operations of the partnership business, and be actually so employed, will afford a very cogent presumption that it was intended to be held as partnership property ; and in the absence of all countervailing circumstances it will be absolutely decisive." *Per Story, J., in the case of Hoxie* v. *Carr et al.,* 1 *Sum.* 181, *Harvey* v. *Pennypacker et al., pp.* 25, 26, *per Bates, Chancellor.* It will be observed that we have not found in the evidence admitted in this case any direct proof of an understanding or agreement between the partners of the firm that Achilles Hollingsworth should bid off the real estate at the sheriff's sale and take deeds for it in his own name, and the firm should pay for it, although, none of them needed or could have desired to become the owners of it, except for their partnership business. There can then be, of course, no reason for considering the trust in this case an express trust. After having thus stated the general principle of equity jurisprudence as well recognized and settled, especially in such cases as this, and referring to the authorities cited in support of it, we do not deem it either necessary or proper to indulge in any mere supposition or conjecture to find a reason for the purchase of the real estate and for the taking of the deeds for it in Mr. Hollingsworth's name alone, but if it were allowable to do so, besides others, a sufficient and satisfactory ground for it might be found in the fact mentioned in the argument, that if not entirely free from the liens and incumbrances of other judgments at

that time, he was, at least, more so than either of the other partners.

There is no evidence in the case that there was any settlement had or account taken between James Rice and the other members of the firm, or with Achilles Hollingsworth, on his withdrawal from it in the year 1854, for or on account of his equitable rights and interests in the said real estate, or at any time before or after its dissolution by his retirement from it.   It is in evidence, however, that immediately upon that dissolution the remaining partners, Mr. Hollingsworth and Mr. Harvey, proceeded under the same copartnership name, in the same copartnership business, and in possession of the same real estate, and without any other change whatever in it than his withdrawal from it, until the final and total dissolution of it afterward by the death of Mr. Hollingsworth in 1865, Mr. Rice's death having preceded his in the year 1861.   It also appears that since the death of Mr. Hollingsworth, his executor, Mr. Pennypacker, and his widow and devisee, Mrs. Hollingsworth, up to the time of the filing of their answer had paid the interest on the unsatisfied mortgages executed by him to secure the purchase-money, and also the

| | |
|---|---:|
| Mortgage of Del. Fire Ins. Co., for . . . . . | $450 00 |
| On the Farmers' Bank Mortgage, for $2,100.00, . | 500 00 |
| Bal. of McDaniel & Harvey's Mortgage, for $1,800.00, . . . . . . . . . . . . . . | 1,000 00 |
| | $1,950 00 |

the devisee having been in the exclusive receipt of the rents and profits of the real estate since his death.

We will next notice in this connection the objection taken to the relief sought by the complainant on this branch of the case because of the delay which had ensued in the institution of the suit.   In regard to a trust of real estate, no limitation whatever exists in courts of equity against a bill to establish it without a repudiation or denial of it by the trustee, or what is equivalent to it, that he has in point of fact held the land as his own for a period of twenty years at least, and without account-

ing in any manner for the rents and profits as trustee.   Courts of equity are not in terms bound by the stutute of limitation, because they in terms apply to legal remedies only.   But they are in effect addressed to courts of equity as well as to courts of law as it seems in all cases of concurrent jurisdiction at law and equity (as, for example, in matters of account) to which they directly apply, and in which they seem equally obligatory in each court.   It has been justly observed that in such cases courts of equity do not act so much in analogy to the statutes as in obedience to them.   In a great variety of other cases they act upon the analogy of the limitations at law.   Thus, for example, if a legal title would in ejectment be barred by twenty years' adverse possession, courts of equity will act upon the like limitation and apply it to all cases of relief sought upon titles or claims touching real estate. 2 *Sto. Eq. Juris.*, sec. 1520 ; *Hovenden* v. *Lord Annesley,* 2 *Sch. & Lefr.* 630 ; *Bond* v. *Hopkins,* 1 *Sch. & Lefr.* 429 ; *Cholmondley* v. *Clinton,* 2 *Jac. & Walk.* 141 ; *Grenfelt* v. *Girdlestone,* 2 *Younge & Coll.* 662 ; *White* v. *Parnther,* 1 *Knapp* 226 ; *Boone* v. *Chiles,* 10 *Pet.* 177 ; *McKnight* v. *Taylor,* 1 *How.* 161.   These cases clearly show, first, that courts of equity have at all times upon general principles of their own, even where there was no analagous statutable bar, refused relief to stale ·demands where a party has slept upon his right and acquiesced for a great length of time ; and secondly, that whenever a bar has been fixed by statute to the legal remedy in a court of law, the remedy in a court of equity has been confined to the same period in analogous cases.   To apply the principle to the present case, it only remains to observe that we have no proof in it that Achilles Hollingsworth ever claimed or alleged that he purchased the real estate in question for himself individually, or that he paid for it with his own money or with money loaned to him for that purpose by the partnership, or that he ever repudiated or denied the trust which we consider clearly resulted for the benefit of the original firm, from the facts proved, and the payment for it by him out of the partnership funds ; while it is equally clear that there was no adverse possession of it as against James Rice or his heirs-at-law until after the death of Achilles Hollingsworth in

1865, when it passed under the general devise of his real estate in his last will and testament to his widow and devisee, but who had so held and possessed it for considerably less than twenty years when this suit was commenced, and which would therefore constitute no bar under the twenty years' limitation prescribed by our statute in an analogous case in the courts of law of this State, in accordance with the well-settled principles established in the cases last cited.

We shall have occasion to say but comparatively little on any other part of the case presented in the bill of complaint. They all consist of money demands merely alleged to be due to the complainant as the administrator of James Rice, deceased, from the late firm of Hollingsworth, Harvey & Co., of which he was a member from the year 1842 until the year 1854, but more particularly, as contended for in the argument, of a note alleged to have been lost and never paid for money due to him individually from the firm, and for moneys advanced and loaned to the firm from time to time by him while he was a member of it, evidenced as is alleged by numerous memorandum bank checks of the firm given to him for that purpose when such loans were made, and which still remained among his papers unpaid, and had only been discovered as late as in the year 1866, and two others in 1869, amounting in the aggregate to a very large sum of money, but to which a considerable number of counter checks of a similar description from him to the firm were produced in evidence on the other side. To all of these demands, however, against the late firm the defendants, Mr. Pennypacker and Mrs. Hollingsworth, have pleaded the statute of limitation, and as to which the complainant relies, in the first place, on a distinct acknowledgment proved to have been made by Amor H. Harvey on or about the 19th day of November, 1869, to the effect that the balance in favor of James Rice between the checks drawn by the firm and held by James Rice, and the checks of James Rice held by the firm, amounting to the sum of thirteen thousand five hundred and thirty-nine dollars and eighty-six cents, and the lost note before referred to, for two thousand five hundred and ninety-six dollars and five cents, were still subsisting demands against the said firm, to take the

case as to them out of the operation of the statute.    But neither
this court nor any other court of equity, we apprehend, will
allow an acknowledgment of a stale demand made by a former
partner so long after the dissolution of the firm and the accruing
of the cause of action (fifteen years or more), and under such cir-
cumstances as accompany it and impeach the fairness and *bona
fides* of the transaction in this case, to be given in evidence for
the sole purpose of reviving it and taking it out of the opera-
tion of the statute, as against the legal representatives of a former
and deceased partner, and in a case particularly in which no
relief and no decree is prayed for against himself.    The acknowl-
edgment must, therefore, be excluded from the evidence in the
case.

The other ground on which the complainant relies to take
these personal claims out of the operation of the statute of limi-
tation, is that he seeks in this case a remedy against the real
estate in controversy, as being the only asset of the first firm of
Hollingsworth, Harvey & Co. that is within his reach, and that
he seeks the two amounts before stated, not as a personal claim
against a former and living partner of it, nor against the legal
representative of the former and deceased partner, or even his
devisee, but having established a resulting trust in favor of the
partnership in the real estate now held by Mrs. Hollingsworth,
he contends that the same or its proceeds after sale under
the decree of the court must be brought into court for distribu-
tion, and being necessarily brought into court for distribution
by a decree that there is a resulting trust in favor of that firm,
he is entitled without any further account (the balance due on
the memorandum checks and note to James Rice having been
definitely and finally ascertained between him and the firm, and
so indorsed thereon by Achilles Hollingsworth about the time
of James Rice's retirement from it), to have paid to him out of
such proceeds the amounts so remaining due to him with inter-
est to the date of the decree; and that they should be ordered
to be paid out of the fund which comes into court necessarily
from the sale of the real estate as assets of that firm, is a conclu-
sion which, of course, follows from the well-settled principles of
the law of partnership.    They consist of advances made by

James Rice over and above his original contributions as a member to it. There are no creditors of the firm remaining unpaid, and it is therefore to be dealt with and disposed of by the court upon the rights of the partners as between themselves. These ascertained amounts and claims for advances against the fund are to be paid before any division or distribution is made among the partners ; no such claims exist on the part of either of the other partners, and consequently the fund is chargeable alone with these claims of his.

After thus minutely analyzing and defining and reducing these personal claims and the real estate itself to their last stage in the Court of Chancery, as we have thus seen, the ground next taken is that he has in equity a partner's lien on all the partnership property, real or personal, of that late firm for the payment of these personal claims for advances made over and above his original contribution to its capital, for which we are referred to *Sto. on Partn.*, secs. 97, 98; *Coll. on Partn.* 125; *Hoxie* v. *Carr*, 1 *Sum.* 173 ; 1 *Ves.* 142 ; 5 *Metc.* 562, and which will not be questioned by us for a moment. But he then proceeds one step further, and having completely resolved the real estate into personalty in the crucible of a court of equity, as must necessarily be done by a decree to that effect in order to reach it and obtain satisfaction of those personal claims out of the fund resulting from the process under the decree, he with great inconsistency in the next place contends that his lien as such partner for such personal claims is a lien on the real estate as the sole remaining asset of that firm, and is analagous in equity to a vendor's lien for the purchase-money on land sold and delivered, in the hands of the purchasers until it is paid for, which is good for twenty years, and therefore this lien of the claims and the right to the payment of them out of the real estate cannot be barred in less time. For which we are referred to 1 *Hil. on Mort.* 656 ; 11 *Gill. & Johns* 218 ; 1 *Bland. Ch. Rep.* 236, which we find, however, have no relation to the subject of a partner's lien in such a case, but refer solely to a vendor's lien. But the law on the subject of a partner's lien in any and all cases is well settled, and is so well stated by Justice Story in the case of *Hoxie* v. *Carr et al.*, cited on behalf of the complain-

ant, that we shall content ourselves with the citation of it without any other authority, to show that a partner's lien, even on the real estate of his firm for advances made to it, is a personal lien purely in equity, and expires with the extinction of the claim by the bar of the statute, and in that respect bears no resemblance or analogy whatever to a vendor's lien in a court of equity. *Story, J.*, says : "A question often arises whether real estate purchased for a partnership is to be deemed for all purposes personal estate, like other effects. That it is so as to the payment of partnership debts and adjustment of partnership rights and winding up the partnership concern is clear at least in the view of a court of equity; but whether it becomes personal estate as between the executor or administrator of a deceased partner and his heir or devisee is quite a different question, upon which learned judges have entertained opposite opinions." *Hoxie* v. *Carr*, 1 *Sum.* 173.

We therefore think that the personal claims of every description embraced in the bill of complaint, except for rents and profits of said real estate and the proceeds of any part or parts of it which may have been sold, are absolutely barred by the plea of the statute of limitation, and that there are no considerations of hardship, accident, or misfortune growing out of the facts of the case, such as the loss of the note or the long delay which elapsed before the accidental discovery of the memorandum checks referred to, which could warrant a court of equity in holding otherwise in this case, since no designed or fraudulent concealment of them by any one is charged in the bill, and the fact that the note and the memorandum checks were alike barred at the time of the death of James Rice, no diligence on the part of his administrator could possibly have saved them from the bar of the statute if he had found them all on his immediately coming into his office as administrator.

The Chief Justice concurred. Wootten, Judge, absent.

*Wales, J.:* The view which I have taken of the law and of the evidence in this case compels me to dissent from so much of the opinion of the majority of the court as establishes a resulting trust in accordance with the prayer of the complainant.

The case is not a novel one in principle, nor do the facts as alleged on either side take it out of the ordinary range of similar claims. The complainant seeks to establish an interest in real estate, not only without a deed, but in opposition to the written and recorded title of another, and courts of equity have been for so many years and so frequently called upon to consider and decide like cases that the principles governing this class of claims have become well defined and settled. So well is this understood that, in the argument before this court, there was no dispute over these principles except as to the lapse of time necessary to bar a claim for a resulting trust. The question to be decided, therefore, is more one of fact than of law, to wit: Did Achilles Hollingsworth purchase the real estate for himself individually or as a member of the first firm of Hollingsworth, Harvey & Co., with the partnership money and for the partnership use and benefit? In other words, was there a resulting trust in Achilles Hollingsworth for the use of Hollingsworth, Harvey & Co.?

A brief consideration of the law on the subject of resulting trusts of the character set up by the complainant's bill will here be in place, before examining the evidence, in order to reach a satisfactory conclusion. As already intimated, there is little, if any, difference of opinion as to the definition of a resulting trust. Indeed, the only variance to be found in the text-books and in recent reports is one of phraseology, and not of substance. To constitute such a trust it is necessary, first, that the person in whose right the trust is claimed must have advanced the purchase-money or incurred a personal liability for its payment; second, that the purchase-money must have been paid, or the liability incurred, at the time and as part of the original transaction, and the trust must attach, if at all, by virtue of the circumstances of the transaction itself, and cannot be raised from subsequent matter arising *ex post facto*. (2 *Sugd., V. & P.* 131.) The law is well stated by Chief Justice John M. Clayton in *Newells* v. *Morgan*, 2 *Harr.* 229, which, like the present case, was an appeal from Chancery. The chief justice says, citing *Dyer* v. *Dyer*, 2 *Cox* 92: "Soon after the statute of frauds passed it was determined that if

an estate be purchased with the money of A., and the estate is conveyed to B., B. will be a trustee for A., and it is such a resulting trust by implication of law as is saved by the statute and needs no declaration. The substance of the cases on this subject appears to be that the trust of a legal estate * * * whether taken in the names of the purchasers and others jointly or in the name of others without that of the purchaser; whether in one name or several; whether jointly or successively, results to the man who advances the purchase-money; and this in analogy to the rule of the common law that where a feoffment is made without consideration the use results to the feoffer." But the trust must have been coeval with the deeds or it cannot exist at all. The resulting trust not within the statute of frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust* and the deed not taken in his name. The trust results from the original transaction at the time it takes place and no other time, and it is founded on the *actual payment of money* and on no other ground. (Chancellor Kent in *Botsford* v. *Burr, Johns. Chy.* 405.) It cannot arise from a loan—that is, where the grantee has borrowed the money with which to pay for the property and takes the deed in his own name; and if the deed is made in the name of the lender by way of security for the repayment of the loan, the equitable title will vest in the borrower. (*Boyd* v. *McLean*, 1 *Johns. Chy.* 590.)

It is well settled that a trust of this character may be proved by parol evidence, but with this doctrine is indissolubly connected another and vitally important one, to wit, that such evidence must be clear, full, and satisfactory. Says Chancellor Kent, in *Boyd* v. *McLean*, just referred to, "the cases uniformly show that the courts have been deeply impressed with the danger of this kind of proof, as tending to perjury and insecurity of paper title; and they have required the payment of the *cestui que trust* to be clearly proved;" and he cites the case of *Lench* v. *Lench*, 10 *Ves.* 511, where Sir William Grant did not deem the unassisted oath of a single witness to the mere naked declaration of the trustee admitting the trust as sufficient, and there were no corroborating circumstances in the case. He thought

the evidence too uncertain and dangerous to be depended upon. The doctrine of resulting trusts is admitted to be a very dangerous and questionable one, and is acted upon only with great caution, especially after much time has elapsed. In several of the States it has been done away with by legislation, except in cases of fraud, to the extent that no resulting trust shall arise or be claimed where the deed has been made to and in the name of the grantee with the knowledge and consent of the person paying the consideration. The history of the law on this subject is one of slow, hesitating, and cautious progress. At first it was doubted whether parol evidence could be received to impeach and contradict the written terms and meaning of a deed of conveyance executed with all the formalities belonging to an instrument of that nature. It was at length decided that such evidence could be admitted, not to contradict and control the written terms of the deed, but to engraft a trust upon the legal title, and that to do this the payment of the money must be clearly proved, as by evidence going directly to the fact of payment or by admissions of the nominal purchaser. The next question that came up was, whether such evidence could be admitted under any circumstances against the answer of the nominal purchaser denying the facts on which it was attempted to establish the trust; and this stage having been reached, another subject of controversy arose on the point whether, after the death of the nominal purchaser, parol was admissible to prove a resulting trust. The negative of this last proposition has been maintained by able lawyers (1 *Saunders on Uses and Trusts* 354; *Roberts on Frauds* 99), while in *Hill on Trustees* 95 it is guardedly laid down that, "Upon the whole, the preponderance of authority seems to be in favor of the admissibility of parol evidence to support a resulting trust, as well after the death of the nominal purchaser as in his lifetime, although the purchase deed expressly state the money to be paid by the nominal purchaser;" but the author carefully adds, "however, it is to be observed that where the evidence is merely parol, it will be received with great caution, and the court will look anxiously for some corroborating circumstances in support of it; and in

23

cases of this nature the claimant in opposition to the legal title should not delay the assertion of his right, as a stale claim would meet with little attention." And last of all came the question as to the lapse of time and the operation of the statute of limitations in defeating the execution of a trust. On this point there is some discrepancy of opinion among the authorities, the only well-recognized principle being that where the trust is created merely by implication or construction of law, the plea of lapse of time will be more readily admitted as a bar to any claim by the *cestui que trust* than in the case of an express trust. (*Hill on Trustees* 265.)

After this cursory review of the law defining the elements of and the incidents to a resulting trust of the nature claimed by the complainant, the inquiry may now be made, Has he furnished a sufficient proof of facts in support of a trust to entitle him to a decree in his favor ?

The evidence produced by him to establish this part of his case may be arranged in the following order :

1. Entries on the books of Hollingsworth, Harvey & Co., made by Achilles Hollingsworth, and as such, being admissions that the purchase was made with the funds of the firm, and for its use and benefit.

2. The occupation of a principal portion of the property by the firm from and soon after the time of purchase as adapted to and fitted for their business, and the absence of any claim or charge for the rent of the same by Achilles Hollingsworth.

3. The paper A, in the handwriting of Achilles Hollingsworth, setting forth a statement of the assets and liabilities of the firm, and including the estimated value of the real estate as a part of such assets.

4. The testimony of Messrs. James Hollingsworth, Teas, and Valentine, and of Mr. Patton.

1. The first entries on the firm books in which mention is made of real estate are under the date of December 31st, 1849, and are as follows :

Achilles Hollingsworth (for real estate) Dr.

To cash for ten hundred and four dollars which he
    paid to Isaac Grubb, Sheriff, in October last,
    being ten per cent. of the purchase-money on
    the property late of James Hollingsworth and
    Joseph Teas, which he purchased at sheriff's
    sale in August last, . . . . . . . . . . $1,004 00
For ten dollars paid interest on the above account
    for sixty days, . . . . . . . . . . . . 10 00
For eleven 50-100 dollars paid Thomas J. Mahaffy,
    tax against Hollingsworth and Teas property, 11 50
For sundry expenses to New Castle, . . . . . 3 50
For three dollars paid Isaac Hollingsworth for fas-
    tening up shop, . . . . . . . . . . . 3 00
For nine dollars and twenty-six cents paid insur-
    ance company, October 14th, last, . . . . 9 29
For two dollars and twelve cents paid Biddle, Pro-
    thonotary, . . . . . . . . . . . . . 2 12
For twenty dollars paid Mrs. Ann Billany, for inter-
    est on bond, . . . . . . . . . . . . 20 00

It is contended, on the part of the complainant, that these entries conclusively fix the character of the transaction to which they relate, and are equivalent to acknowledgments by Achilles Hollingsworth that the real estate was bought with the money of the firm and for the firm. In support of this interpretation of their meaning, the testimony of five witnesses, who were examined as experts in the science of bookkeeping, was offered, and they, without exception, were of the opinion that the entries indicate that the real estate was bought for the firm by Achilles Hollingsworth, and that it was a "real estate account" and "a firm account." One witness says, "A. H. was the agency through which the transfer of cash was made to the sheriff." The same witness adds: "From the connection of A. H.'s name alone with the entry, it tends to complicate it. From a bookkeeper's standpoint, I can see no object of associating the

name of A. H., except to set forth the fact that he was the agent of his firm in the transaction" * * * * "personal transactions are never properly attached to partnership accounts." (*W. G. Gibbon's test., p.* 76.) On p. 81 of complainant's testimony, Mr. Woolley, a well-known accountant, says : "I have examined all the accounts and original entries referred to in the interrogatory. The nature of the account in my opinion is real estate belonging to the firm." On cross-examination he admits that a private venture in real estate by one partner on his individual account might be kept on the firm books with the consent of the firm, and that the entries A. B. (the individual member) for real estate Dr. to Cash, and Cash Dr. to A. B. for real estate, would be the proper ones, and would apply to money borrowed from the firm from time to time to pay liens, interest on liens, repairs, taxes and insurance, and to money received for rents from portions of the real estate. George W. Elliott is equally positive that "these entries clearly indicate firm property" (p. 95), and J. Groesbeck, another expert, says : "Most decidedly, it is the firm's business, and that includes the ownership of the real estate. These entries signify firm's real estate" (p. 106). The last two witnesses agree that an individual account of a real estate venture may be kept on the firm books with the consent of the firm.

J. Taylor Gause is the first witness produced on the part of the defendants as an expert, who, to use his own words, has " had a good deal to do with the science and practice of double-entry bookkeeping since 1843." He testifies that the account as opened on the books is perfectly correct and proper. " I consider it an individual account with the firm." "I have examined several of the entries as posted on folio 37, and find charges for interest paid on liens against the property, repairs done to buildings, rents collected, all of which indicate that A. H. was the owner of the property." He also says that it is consistent with the science of double-entry bookkeeping for a member of a firm to have a dozen accounts, if the nature of his transactions require them. Eli Garrett has been concerned in bookkeeping since 1855. In his judgment the entry in Book D signifies that "Mr. Hollingsworth was the owner of that real estate—this is the

story of the transaction;" and that it is not inconsistent with correct bookkeeping for a member of a firm to have two or more accounts on the firm ledger. He keeps several such accounts. In addition to Messrs. Gause and Garrett, five other practical bookkeepers testify as decidedly and directly to the same effect. These entries are mostly in the handwriting of Achilles Hollingsworth, who had charge of the books, which were at all times during the existence of the partnership subject to the inspection of all the partners. What, then, do they mean? If there was no other testimony in the cause, would they be sufficient to sustain the charge that the real estate was bought for the firm and belonged to the firm? Clearly, not; and this conclusion is confirmed by the testimony of Charles S. Robb, whose veracity, although it has been seriously questioned, has not been successfully impeached, and who, as far as we may judge from the papers filed in the cause, is entitled to equal credit and consideration with the other witnesses whose testimony has been admitted. He was in the employ of the firm as an apprentice as early as 1853, and was afterward engaged as bookkeeper from 1856 or 1857 to 1865, that engagement ceasing in September, after the death of Achilles Hollingsworth. Mr. Harvey gave his attention to the mechanical part of the business, while A. Hollingsworth acted as financier and correspondent. Mr. Rice was not known to Robb as a member of the firm. Mr. Harvey had the same access to the books that Mr. Hollingsworth or witness had and frequently examined them. In 1865, sometime after the death of Mr. Hollingsworth, Mr. Harvey took the books and papers of the firm to his private residence. The important part of the testimony of this witness is, that he was directed and instructed by Mr. Harvey, in the latter part of July or August, 1865, to make a settlement of the partnership accounts upon the basis that all the expenses connected with the real estate should be charged to Mr. Hollingsworth, and that all the rents for the same which had been received by the firm should be entered on A. H.'s real estate account, together with the old boiler and shafting that had been taken out at or about the time of the purchase; and that A. H.'s real estate account should be credited with six hundred dollars per annum for rent

of that portion of the property occupied by the firm in carrying on their business.

Robb further testifies that during the lifetime of A. H., " Mr. Harvey has paid to me to be handed to Mr. Hollingsworth as his property rents from this real estate in controversy. That occurred often. It was always understood to be his property." (*Deft.'s test., p.* 16.) On this point of the receipt and appropriation of the rents, Robb does not stand alone. Jarrett Megaw, who was in the employ of the firm for many years, and part of the time as the special agent of James Rice, says that " when rents were paid I would receipt in the name of Mr. Hollingsworth and hand it over or put it in the fire-proof and report to him that I had collected so much. I signed the receipts 'A. H. per Jarrett Megaw.'" (*Deft.'s test., p.* 50.) Finally, on the sale of the firm's personal property to Megaw & Billany for seventeen thousand dollars, Mr. Harvey said, according to Robb, that the surplus, after paying the debts of the firm, would be to divide, and that he did hand over to W. G. P., the executor of A. H., a bond of Megaw & Billany for some four thousand dollars, on account of what might be due him as executor from the proceeds of sale. (*Deft.'s test., p.* 19.) There is nothing at all improbable or unreasonable in what Robb has said of the instructions, conversations, and actions of Harvey, nor does his testimony appear to have been successfully contradicted or impeached.

Now, if Robb's statements are worth anything, and are taken in connection with the testimony of the defendants' experts and with the intrinsic evidence of the book entries, the conclusion is almost irresistible that the real estate account was the individual and personal account of Achilles Hollingsworth. In corroboration of Robb are the undisputed facts that at the time of the purchase Achilles Hollingsworth paid to the sheriff only ten per cent. of the purchase-money in cash; that before the sale, the property had been subject to a number of liens, but no money over the ten per cent. was paid to the sheriff or applied to the liens, and that on the 28th of December, 1849, Achilles Hollingsworth gave his own bonds and mortgages, in substitution of the liens as they stood in priority, up to the amount of the purchase-money—ten thousand and forty-nine dollars

and sixty-four cents.    These bonds and mortgages were as follows :

| | | |
|---|---:|---:|
| To the Wilmington Savings Fund Society, . . . | $2,400 | 00 |
| To Ann Billany, . . . . . . . . . . . . | 700 | 00 |
| To Delaware Fire Insurance Company, . . . . | 450 | 00 |
| To Farmers' Bank, afterward ass'd to Sav'gs Fund Society, . . . . . . . . . . . . | 2,100 | 00 |
| To McDaniel & Harvey, afterward ass'd to Jesse Lane, . . . . . . . . . . . . . . | 1,800 | 00 |
| To John Rice, a judgment bond, . . . . . . | 1,595 | 64 |
| | $9,045 | 64 |
| Which, with 10 per cent., . . . . . . . . | 1,004 | 00 |
| Makes the entire purchase-money, . . . . | $10,049 | 64 |

About three thousand dollars of the principal of these securities was paid off during the lifetime of Achilles Hollingsworth for the most part out of the partnership funds, and charged to his real estate account, together with the interest as it became due, and after his death the sum of one thousand nine hundred and fifty dollars was paid out of his estate, leaving a balance of four thousand dollars still unpaid, and for which his estate is liable.

2. The possession and improvement of a large portion of the property by the firm are relied on to prove the equitable ownership of H., H. & Co.   But neither possession nor outlay for improvement can avail against the payment of rents and Robb's testimony.   The expenses for repairs and alterations were charged against the real estate account of A. H., and the rents of the dwelling-houses placed to his credit, while on the settlement of the partnership affairs by Harvey's direction the estate of A. H. was to be allowed six hundred dollars per annum for the use of the shops and buildings occupied by the firm.   From whichever side then these accounts may be examined, they either prove title and estate in A. H. or they leave the question of ownership so much in doubt as to prevent a clear under-

standing of what they do mean. There is no doubt that use, occupation, and outlay of money for permanent improvements without payment of rent or its equivalent may be, under some circumstances, presumptive evidence of ownership or of interest in the property beyond that of a tenant. Here, however, the legal owner was the active partner, financier, and bookkeeper of the firm. The books are admitted to have been carelessly kept, the firm was declining toward insolvency for several years, no balance sheet was taken off, and A. H. may have thought that there would be time enough to make charges for rent when the firm had settled with and paid off its outside creditors. Be this as it may, Harvey, the surviving partner, and who ought to know the history of the firm's business, directed that the yearly rent of six hundred dollars should be credited to the account of his deceased copartner, A. H.

3. The next matter relied on to prove the trust is the paper A, containing what is claimed to be an exhibit, in the handwriting of Achilles Hollingsworth, of the liabilities and assets of the firm, including among the former the mortgages and liens against A. H., and among the latter the estimated value of real estate. This paper is without date, signature, or *indicia* of any kind to explain its true character and purpose, which are thus left to conjecture. Chancellor Bates, in his opinion in the first case of Harvey against his two co-defendants in the present suit, in endeavoring to reach a solution of its meaning, says: "There is nothing whatever on the paper or any collateral evidence to show the occasion or object for which this statement was made." * * * "We must rather conclude that at sometime while there remained an expectation that the firm would take the property, or pending some proposal to that end, this statement was made in order to show in what condition the assumption of the property by the firm should it be taken would place its liabilities and assets: Its form and appearance indicate that it was made for some transient use or purpose which was not effectuated; for we can hardly suppose that any statement made as an exhibit of the firm's interest in this real estate and of its liability for its liens would not have been entered on its books. Further, the statement, in addition to the mortgage against Hol-

lingsworth, includes also a debt to be added to the original debts of the firm, a mortgage of four hundred dollars to Robert E. Poole, a mortgage which had no connection with this real estate. The presence of this mortgage alone demonstrates that the statement was made in contemplation of some arrangements then executing and not afterward carried into effect. For it is certain that the firm did not in fact by proper conveyances take this property or assume the liabilities set forth, nor did they at any time cease to charge Hollingsworth with payments made on account of the liens. There may have been some omissions to charge him, but they must be treated as accidental."

The defendants' counsel assigns another, and, perhaps, equally natural and reasonable cause for the existence of the paper : " Mr. Hollingsworth's purpose was evidently to show that with what the firm had and what he had, he, as the financial member, could probably meet its liabilities if an extension was granted." It would not be the first or only instance of a member of a quasi insolvent firm contributing his individual property and credit to sustain the sinking fortunes of a partnership. Thus it is seen that at every stage of the investigation of this case the pathway, instead of becoming more open and leading more directly to the point on which the complainant depends to establish his charge, is, as we advance, more and more beset with difficulties, uncertainties, doubts, and conjectures, for the burden of proof is on him by clear, full, and satisfactory evidence to engraft upon the legal title of Achilles Hollingsworth a trust in favor of Hollingsworth, Harvey & Co.

4. The testimony of Valentine, Teas, and James Hollingsworth throws no additional light on the original transaction which has given birth to this suit. They speak of no facts that bear directly on the question. Their impressions, besides being too vague to depend on, are not evidence. Teas mentions conversations between Achilles Hollingsworth and James Hollingsworth in reference to the purchase of the real estate, both before and after the sheriff's sale, of which J. Hollingsworth has no recollection. Their impressions were, at the time of the sale, that the property was bought for the firm. Not one

.of them can testify to the actual fact. Everything is indefinite. They refer to acts, expressions, and events which occurred more than twenty years ago, and after the lapse of so much time it would be perilous indeed to place any reliance on the mere impressions left upon the minds of the witnesses after the facts which created them have been totally forgotten or are but dimly remembered. The facts, if they could be recalled with certainty and distinctness, might bear a very different construction from the one now sought to be attached to them. Facts can be investigated and explained—impressions cannot; and Sir William Grant, in *Lench* v. *Lench*, 10 *Ves.* 517, declares that to be the most unsatisfactory evidence which can be fabricated with facility and is incapable of contradiction. Mrs. Patton's memory is equally unreliable. She was a tenant of one of the dwelling-houses, and the rent (one hundred and twenty dollars) was set off against the annual interest of a debt of two thousand dollars which H., H. & Co. owed to her husband's estate. A. H. negotiated the business with her. Wishing to buy, she inquired of A. H. what he would take for the house, and he replied that they would sell it for one thousand eight hundred dollars, but that they could not give a good title. On further examination, she was uncertain as to the expression used, whether he said "clear title" or " good title," and whether he spoke for himself or for the firm. It is very apparent that, with incumbrances to the amount of nine thousand dollars on the whole property, it might not have been convenient or feasible for the legal owner to convey a clear title to any portion of it, even on the most tempting offer.

Though there is not the slightest ground for questioning the good faith of any of the witnesses, the evidence, on the whole, is contradictory, uncertain, and defective, and does not come up to the full measure of proof required. It will bear more than one construction and is capable of supporting more than one theory. Robb, whose testimony has been freely criticised, is corroborated again and again by Megaw, who says that, after the separation of the personal from the real estate of H., H. & Co., and the sale of the former to Megaw & Billany, the last-

named firm rented the shops and buildings from Mrs. Hollings-
worth, and this with the consent, or, at least, without protest
from Harvey. Megaw had been in the employ of both the
first and second firms of H., H. & Co. during the existence of
each.

The chancellor, in dismissing the bill, adopted the view of his
predecessor in office, and interprets the meaning of the book
entries to be that A. H. borrowed the purchase-money from the
firm, charging himself with the sums taken from the partnership
funds for that purpose, and also with the moneys taken from
time to time to pay off liens, interest, repairs, etc., and thereby
became a debtor to the firm for the amounts so charged. Chan-
cellor Bates, in the Harvey case, thought that the real character
of the payments was that of a loan to Hollingsworth, for which
the firm became not *cestuis que trust* of the real estate but credi-
tors, and that the firm could not be both the owner of the real
estate and Hollingsworth's creditor for payments made on
account of it.

Why the purchase was made by A. H., and title taken in his
name, while the main object seems to have been to benefit the
firm by change of location and increased facilities for doing
business, may be accounted for in the common experience of
partnership concerns. Members of a firm do not always and at
once agree upon what is best for their joint interest, and an
individual partner, with clear foresight and strong convictions,
may determine to assume a responsibility in which his partners
refuse to unite; and it is doing no violence to admitted facts to
suppose that A. H. may have bought the real estate under such
circumstances with the design of having the firm profit by the
transaction in the use of the shops and buildings, and with the
expectation, also, that the firm would take the real estate off his
hands, or, at least, so much of it as should be occupied by them,
whenever the partners should consider it to their advantage to
do so. But assuming this state of facts to be true, it would by
no means leave it *optional* with the firm, or a surviving partner,
or the representative of a deceased copartner, to set up a trust,
either before or after the death of the legal owner.

But to recur to the law. The doctrine of resulting trusts

being deemed " questionable," " dangerous," and as " one of the mistakes of equity," except where fraud is alleged on the part of the purchaser named in the deed, it is most reasonable to require that the burden of proof should fall upon him who attempts to set up the trust, and that the evidence in support of such claims should be clear, full, satisfactory, and convincing ; and that after the lapse of many years and the death of the nominal purchaser, still greater caution should be exercised in admitting and weighing the evidence. All the authorities are at one as to the high standard of proof necessary in such cases. The evidence must not only be distinct and credible, but preponderate, and if it does not the presumption is in favor of the party who has the deed. The payment by the claimant must be proved explicitly, and not be a mere inference or deduction from facts and circumstances. (46 *Mo.* 423 ; 13 *P. F. Smith* 229 ; 2 *Md.* 366.) After the legal title has once passed to the grantee by deed, it is impossible to raise a resulting trust so as to divest that legal estate by the subsequent application of the funds of a third person to the improvement of the property or to satisfy the unpaid purchase-money. The resulting trust must arise, if at all, at the time of the execution of the conveyance. (*Rogers* v. *Murray,* 3 *Paige* 390.) In *Forsyth* v. *Clark & Stewart,* 3 *Wendell* 937, it was held that the appropriation of the joint funds of a copartnership by one of the members of a firm to the purchase of real estate conveyed to such partner in his own name will not create a resulting trust in favor of his copartner, unless the funds were so appropriated in pursuance of an agreement between the parties at the time of the purchase. In that case it was alleged that Clark had purchased certain real estate with funds belonging to Stewart, and that by operation of law there was a resulting trust to Stewart in the property. In commenting on the evidence, Mr. Justice Marcy says : " It is said Stewart furnished the funds with which Clark made the purchase. This assumption is not borne out by the facts of the case. Clark, in the first instance, used no funds for that purpose ; his own bond was substituted for the payment of the consideration money. In discharging the old incumbrance, he used no funds, for that was done by giving his individual bond

and mortgage to Roberts.  If he afterward appropriated the funds in his hands, belonging jointly to himself and Stewart, to discharge the obligations which he had in the first instance laid himself under in making this purchase, a resulting trust would not be thereby created unless it was unequivocally shown that there was an agreement at the time of the purchase that these funds should be so appropriated."  The evidence in that case was much stronger in support of a trust, not only from the circumstances surrounding the purchase, but in the proof of fraud, than in the present one, and yet the court affirmed the decree of the chancellor dismissing the bill.  The analogy between the two cases is still more remarkable in the difficulty which the court finds in the cited case of accounting for the disposition of the rents which were carried to the credit of Clark & Co. on the books of the firm, and the remarks of Justice Marcy in that connection may be applied with great appropriateness to the paper A, to which so much weight has been given.  "When exploring transactions suspected to be fraudulent," says the learned judge, " it often becomes necessary to build our conclusions upon an accumulation of circumstances, and such conclusions are strong or weak according to the number and character of the circumstances by which they are sustained.  Circumstances which are inconsistent with one state of facts do not, however, necessarily prove another state of facts with which they may be made to harmonize.  Combine those which this case presents to us as we may, doubts and difficulties, I apprehend, will arise as to the simple question whether Stewart was *a joint purchaser with Clark* of the west half of the old Tontine Coffee House.  Most of the pretenses that have been set up in opposition to such a conclusion have been scattered, yet competent proof is still wanting to create in the mind a confident reliance on its truth."  The opinion of Judge Story, in *Hoxie* v. *Carr et al.*, 1 *Sumner*, cited by complainant's counsel, does not controvert any of the foregoing authorities.  The evidence there was not defective.  Real estate, bought with the partnership funds, had been conveyed to the several partners in their individual names, and the property thus purchased was almost immediately occupied, used, and improved for the part-

nership business. There was no entry in the firm books of any charges for the real estate against the several members as upon a purchase made on their individual accounts. On the dissolution of the firm, which was heavily in debt, the question arose whether the real estate belonged to the several partners as tenants in common or was to be held as partnership assets. One of the partners had undertaken to sell his share of the realty to the defendants, and the latter declared that they had purchased without notice either express or constructive, that it was partnership property. The only defect in the proof was as to the knowledge of the defendants at the time the conveyance was made to them of the true situation of the firm's affairs, and of this there was strong presumptive proof. Judge Story says: " Some things may, in the present discussion, be assumed as settled, because both upon principle and authority they may now be treated as reasonably free from doubt. In the first place, property purchased with partnership funds does not of necessity become partnership property if that is not the intention of the parties, at least in all cases steering wide of fraud and breach of trust. One partner may certainly withdraw a part of the partnership funds for a separate purchase on his own account, and all may join in a purchase of real estate for purposes wholly independent of the partnership, intending to hold their shares severally on their individual account." The proof, however, of the partnership purchase in that case was too clear and direct to be resisted, and the court, although not finally deciding the cause, on account of the want of proper parties to the bill, intimated what the decision would be. In *Le Fevre Appeal*, Judge Sharswood says: " Partners have an unquestionable right to deal with the funds of the firm as they please; and if with their consent or knowledge or acquiescence a portion of their funds is applied to the purchase of real estate in the name of an individual member and as his private property, there is in such case no resulting trust. He is charged or chargeable with what is so withdrawn and appropriated in account. So if with the knowledge and consent of all the partners partnership funds are applied to the improvement of the real estate of one or more members of the firm." 69 *Penna. S. Rep.* 122.

The opinions of these eminent judges and the adjudged cases before cited all concur in recognizing the right of a partner to apply the partnership funds to his individual use with the consent of his copartners, and that a separate account of his individual purchases and speculations may be kept in the books of the firm; and they also exhibit in a very clear light the great danger of admitting uncertain, equivocal, and purely circumstantial evidence to overthrow a deed or to engraft upon the legal title a trust which perhaps may never have been contemplated by any of the parties. Here there is so much to excite doubt about the true history of the sheriff's sales on the 18th of August, 1849, from the absolute failure to prove any agreement or understanding between the copartners, as alleged in the bill (this court being unanimous in ruling out Harvey's deposition), and by the reflection that the only support for the claim now made is on the book entries, the occupation of a part of the premises by the firm, and the paper A, each and all of which may be and are subject to different and opposite constructions, that it would be extremely hazardous, after the lapse of so many years from the day of sale, and after two of the three copartners have long since died, to make a decree establishing a resulting trust. The difficulty of coming to such a conclusion is increased when it is considered that James Rice lived for several years after his withdrawal from the firm, and though out of business and insolvent, made no demand for any share or interest in the real estate during that time, nor informed any one that he was entitled to such interest; then came the complainant who as the legal representative of James Rice, was empowered to demand and compel a settlement of the partnership affairs and to receive what might have been found due to his intestate, and yet he slept on this claim until 1873, making in all nineteen years from the dissolution of the first firm of H., H. & Co., and upward of twenty-four years from the day of the sheriff's sale. During all this time the actors in the original transaction were passing away and the memory of the survivors becoming more oblivious and uncertain, until at this late day it is attempted to set up a trust unsupported by written proof, and depending on evidence which, viewed in the most favorable

light for the complainant, reasonably admits of a conclusion that defeats his claim.

This leads us to the second branch of the defense—the plea of the statue of limitations.

Although a court of equity is said to be exempt from the compulsory force of the statute, and the operation of the bar is not governed by the same uniform and inflexible rules which prevail in actions at law, yet that court, acting in analogy to the statute, will in a proper case, after the expiration of a great length of time, refuse to enforce a claim which, without neglect, could have been sooner made. Where fraud enters into the transaction, the statute does not run except from the time of its first discovery, or when with reasonable diligence, it might have been discovered. The principles upon which equity applies the statute are here stated within the narrowest limits, for courts of equity have gone so far as, in every case free from fraud, to give the same effect to the statute as is done at law. The policy of the law is, for the welfare of the community, to fix a barrier to litigation, to render individuals secure in the undisturbed possession of their property, and for these objects to extinguish dormant claims. Another reason for the enactment of the statute was found in the difficulty of doing entire justice when original transactions have become obscure by time and the loss of evidence. The statute having been enacted on these grounds, there would seem to be no good reasons why, in the administration of justice, there should be any difference between the courts of equity and the courts of law in the operation of the bar, except in cases of fraud · or of peculiar hardship, relief from which it is the special province of equity to afford.

In Delaware an action at law for the recovery of land must be brought within twenty years from the time when the cause of action accrued. *Amend. Stats.* 727. In applying the statute here, a distinction is to be observed between an express trust, constituted by the act of the parties, and a resulting trust, which is created by implication or construction of law. As between trustees and *cestui que trusts*, an *express* trust will not be barred, because in such cases there is no adverse possession, the possession of the trustee being the possession of the *cestui que trust;*

but where the trust is a resulting one, the lapse of time will be more readily admitted as a bar to any claim by the *cestui que trust* against the trustee. " In such cases the possession of the trustee is usually to a certain extent adverse to the *cestui que trust;* for it rarely happens that such a trust is expressly recognized or admitted by the parties. Though in strictness the statute of limitations can scarcely be said to apply to these equitable cases, courts of equity have always admitted the validity of a defense founded on the analogy of the statutes, and have refused relief where a party with full knowledge, or being in a situation to have full knowledge, of his rights, has delayed for twenty years to prosecute his claim. On more than one occasion a delay of eighteen years in enforcing a claim founded on a constructive trust has been held a sufficient reason for dismissing the bill." *Hill on Trustees* 265. In *Angell on Limitations, chap.* 16 *et seq.*, it is said: " Where the trust, however, is merely *implied,* or constructive, there has been some disagreement among the cases, but the better opinion appears to be that, as in general the facts out of which such trust arises from their very nature presuppose an adverse claim of right on the part of the trustee by implication, from the beginning the statute will commence to run against the *cestui que trust,* from the period from which he could have vindicated his right of action or otherwise." (See *Hill on Trustees* 264, *note* 2.) In *Strimpfler* v. *Roberts,* 18 *Penna. S. Rep.* 283, Chief Justice Black says the doctrine of resulting trusts is not to be favored in ordinary cases, and that a trust resting in a parol is taken to be extinguished after twenty-one years ; that " the whole doctrine is a violation of the sound principles on which the statute of frauds is placed and ought not to be favored except when the trust originated in the bad faith of the nominal purchaser. The extension of it to cases in which the *cestui que trust* has voluntarily placed his rights in such a condition that he can only establish them by parol is of doubtful policy, and, like other departures from the statute of frauds, has probably done more mischief than it has ever corrected." * * * " No man," says Mr. Justice Sergeant, " ought to be permitted to lie by while his rights can be fairly investigated and justly determined

until time has involved them in uncertainty and obscurity and then ask for an inquiry. For such reasons as these it is that every civilized society has fixed a limited time within which all rights must be prosecuted. Where this is not done by positive enactments of the legislature, the judiciary calls in the aid of presumption; and courts of equity, though not bound by the statutes of limitations, close their doors against stale demands as sternly as the courts of law." * * * "Courts of equity will not listen to claims so old that they would be barred at law by the statute of limitations. If this rule, which is in itself so just and wise, needed the authority of great names to support it, Lord Talbot (3 *Atkyns* 325), Lord Redesdale (2 *Schy. & Lefroy* 71), Chief Justice Marshall (10 *Wheaton* 152), Chancellor Kent (3 *Johns. Chy.* 129), and Judge Storey (1 *Eq. p.* 529) ought to be sufficient for the purpose."

The principles to be drawn from these authorities are too obvious, and their application to this case are too apparent, to need elaboration. The decisions in England and the United States on the effect of the lapse of time in defeating ancient demands are uniform and conclusive almost without exception. Courts are always reluctant to overthrow written titles and legal estates by parol, or to encourage litigation by listening to stale claims, more particularly after the death of the party whose actions are brought under review, and who, if living, could perhaps explain them in such a way as to remove all cause for controversy.

There was no fraud in the manner of making title by A. H.; it was done with the knowledge of the firm as the bill admits; nor are there any circumstances of peculiar hardship in the complainant's case on his own showing to entitle him to relief. But, it has been replied that this case is taken out of the operation of the statute by the book entries made in the handwriting of Achilles Hollingsworth up to or near the time of his death, in 1865, and which constitute so many admissions by him that he was the trustee of the firm. This, however, even if sufficient for that purpose, is the assertion of a fact which has not, in my judgment, been satisfactorily proved. It is taking for granted that the evidence has established the fact that the personal account of A. H. is a firm

account, and that each entry on the debit or credit side having reference to the real estate is an acknowledgment that the equitable title to the property is in H., H. & Co.   Neither the books, nor the contradictory opinion of the experts in relation to their meaning, or any circumstance proved in the depositions, warrant that assumption.   The trust, if there was one, commenced on the day of the sale, or, at the latest, on the 29th of December, 1849, the date of the execution and delivery of the deeds, and there being no element of fraud or of peculiar hardship to prevent the operation of the statute, the complainant's claim is barred.*

For these reasons, I am of the opinion that the chancellor's decree, denying the claim of a resulting trust as well as the other demands made by the bill should be affirmed.

---

* The chancellor having decided that the trust was not sustained by adequate proof, did not, in his opinion, consider the plea of the statute.